## IN THE SUPREME COURT, STATE OF WYOMING

### 2016 WY 25

*October Term, A.D. 2015*

February 24, 2016

BOARD OF PROFESSIONAL
RESPONSIBILITY, WYOMING
STATE BAR,

Petitioner,

v.                                                        D-15-0007

LAURENCE W. STINSON, WSB No.
6-2918,

Respondent.

### ORDER SUSPENDING ATTORNEY FROM THE PRACTICE OF LAW

[¶1]    **This matter** came before the Court upon a "Report and Recommendation for Suspension," filed herein December 9, 2015, by the Board of Professional Responsibility for the Wyoming State Bar.  After a careful review of the Report and Recommendation; the attached "Affidavit of Costs and Expenses;" Respondent's February 10, 2016 letter (in which he informs the Court he does not file exceptions to the report); and the file, this Court finds the Report and Recommendation for Suspension should be approved, confirmed, and adopted by the Court and that Respondent, Laurence W. Stinson, should be suspended from the practice of law for a period of nine months.  It is, therefore,

[¶2]    **ADJUDGED AND ORDERED** that the Board of Professional Responsibility's Report and Recommendation for Suspension, which is attached hereto and incorporated herein, shall be, and the same hereby is, approved, confirmed, and adopted by this Court; and it is further

[¶3]    **ADJUDGED AND ORDERED** that, as a result of the conduct set forth in the Report and Recommendation for Suspension, Respondent, Laurence W. Stinson, shall be, and hereby is, suspended from the practice of law for a period of nine months, beginning March 7, 2016; and it is further

[¶4]   **ORDERED** that Respondent shall comply with Section 22 of the Disciplinary Code for the Wyoming State Bar.  That Section governs the duties of disbarred and suspended attorneys; and it is further

[¶5]   **ORDERED** that, pursuant to Section 26 of the Disciplinary Code for the Wyoming State Bar, Laurence W. Stinson shall reimburse the Wyoming State Bar the amount of $25,247.99, representing the costs incurred in handling this matter, as well as pay an administrative fee of $500.00, by paying the total amount of $25,747.99 to the Clerk of the Board of Professional Responsibility on or before June 1, 2016; and it is further

[¶6]   **ORDERED** that, pursuant to Section 4(c) of the Disciplinary Code for the Wyoming State Bar, Laurence W. Stinson, on or before June 1, 2016, shall make restitution to John McClure and Robin McClure in the amount of $11,641.17, which represents the attorneys' fees and costs the McClures incurred in defending the New Dehli lawsuit; and it is further

[¶7]   **ORDERED** that, pursuant to Section 4(a)(iv) of the Disciplinary Code for the Wyoming State Bar, this Order Suspending Attorney from the Practice of Law, along with the incorporated Report and Recommendation for Suspension, shall be published in the Wyoming Reporter and the Pacific Reporter; and it is further

[¶8]   **ORDERED** that the Clerk of this Court shall docket this Order Suspending Attorney from the Practice of Law, along with the Report and Recommendation for Suspension, as a matter coming regularly before this Court as a public record; and it is further

[¶9]   **ORDERED** that the Clerk of this Court cause a copy of the Order Suspending Attorney from the Practice of Law to be served upon Respondent Laurence W. Stinson.

[¶10]  **DATED** this 24th day of February, 2016.

**BY THE COURT:***

/s/

**E. JAMES BURKE**
**Chief Justice**

*Justice Davis took no part in the consideration of this matter.

IN THE SUPREME COURT
STATE OF WYOMING
FILED

DEC - 9 2015

CAROL THOMPSON, CLERK

by DEPUTY

**BEFORE THE WYOMING SUPREME COURT**

**STATE OF WYOMING**

| | |
|---|---|
| **In the matter of** | ) |
| ***LAURENCE W. STINSON,*** | ) |
| *WSB # 6-2918,* | )  *WSB No. 2014-102* |
| | ) |
| *Respondent.* | ) |

D - 15 - 0007

## REPORT AND RECOMMENDATION FOR SUSPENSION

THIS MATTER having come before the Board of Professional Responsibility (Board) for hearing September 21-25, 2015, at the Cody Hotel, 232 West Yellowstone Avenue, Cody, Wyoming, and the Wyoming State Bar appearing by and through Mark W. Gifford, Bar Counsel, and Respondent, Laurence W. Stinson, appearing in person and representing himself, and the Board having heard the testimony of witnesses and having reviewed the exhibits received into evidence at the hearing, and being fully advised in the premises, FINDS, CONCLUDES and RECOMMENDS:

### FINDINGS OF FACT

1. Upon commencement of the hearing, Respondent requested and was provided an opportunity to *voir dire* each member of the Board to determine whether any member harbored bias or prejudice against Respondent. After conducting such *voir dire*, Respondent made no objection to the Board or any individual member, and the hearing proceeded.

2. Respondent has been licensed to practice law in the State of Wyoming since 1995, and has maintained, and continues to maintain, a law practice in Park County, Wyoming. This matter arises from certain disputes that arose between Respondent and two former clients, John and Robin McClure, from whom Respondent purchased a lot in a residential subdivision in Cody, Wyoming, in 2007.

3.	At the time of the lot purchase, the McClures owned and operated McClure Custom Builders, Inc., a company that performed construction work in Park County, Wyoming. John McClure was a licensed general contractor and had provided construction work at Respondent's residence and at his office in Cody. Robin McClure was a licensed real estate agent.

4.	The McClures owned an unimproved lot ("Lot 10") adjacent to their home on Ina Avenue in the Meadows Subdivision in Cody.

5.	In early 2007, Respondent talked with the McClures about purchasing Lot 10 and having the McClures build a house for him on the lot.

6.	Seeking legal advice regarding business planning and estate issues, the McClures met with Respondent on February 20, 2007. On March 31, 2007, Respondent sent the McClures an invoice in the amount of $150.00 for a one-hour meeting on February 20, 2007. BC-1. Respondent's billing records indicate that the McClures next sought legal advice from Respondent on September 11, 2007, when they requested his assistance in preparing an addendum to a construction contract for one of the McClures' construction projects unrelated to Respondent. BC-9.

7.	Prior to Respondent's purchase of Lot 10 from the McClures, the McClures provided Respondent with several books containing various house designs. Respondent selected a design he liked, and asked the McClures to order a set of plans for him.

8.	In conjunction with ordering the plans for the house design selected by Respondent, the McClures purchased an online budget tool from Cobs Homes which would generate a "Cost to Build Budget" based upon square footage, materials, cost of the land, and other factors. On March 20, 2007, the McClures provided Respondent with a copy of the Cost

2

to Build Budget, which indicated a total cost to build of $370,944.00, inclusive of a land cost of $65,000.00.

9. On March 29, 2007, Respondent executed a written Purchase Agreement for Lot 10 (BC-2), agreeing to purchase the lot from the McClures for $65,000.00. In the Purchase Agreement, Respondent was identified as "BUYER" and the McClures were identified as "SELLER." The Purchase Agreement provided, among other things:

- "SELLER Robin O. McClure is an active and licensed real estate agent with the State of Wyoming for Worthington Realty of Wyoming, LLC."
- "BUYER is an attorney with the law firm of Bonner Stinson, PC, and has, in that capacity, represented Seller or their interests. SELLER acknowledges that neither BUYER or his law firm is representing the seller herein, and the same are not protecting SELLER's interest in this transaction. SELLER and BUYER further acknowledge and agree that the sale price agreed herein was the asking price set by SELLER and was accepted by BUYER without further negotiation."
- "5. There are no verbal agreements between BUYER and SELLER or either party's agent to modify terms and conditions of this contract. . . . [T]here are no representations by SELLER or its AGENT not included in this Agreement."

10. Notwithstanding the Purchase Agreement's written disclaimer of additional verbal agreements between the parties, Respondent contends and testified that he entered into the Purchase Agreement based upon the McClures' representation that the house selected by Respondent could be built on Lot 10 for $400,000.00 or less, inclusive of the $65,000.00 cost of the lot. The McClures deny making such representations, and state that the Cost to Build Budget was merely a "starting point" for further discussions regarding construction of a house on Lot 10.

11. Respondent's purchase of Lot 10 closed on April 26, 2007, with Respondent paying the purchase price and receiving a deed in return. BC-3.

12. On May 8, 2007, Robin McClure emailed a draft contract entitled "SHORT-FORM FIXED PRICE AGREEMENT" to Respondent. BC-4.

13. In order to arrive at an accurate cost estimate for constructing the home on Lot 10, it was necessary to have an engineer prepare a foundation design for the structure before bids could be obtained from subcontractors. In May 2007 John McClure engaged a professional engineer to design a foundation for the house. LWS-5.

14. Sometime after May 8, 2007 (but before Respondent sent his July 8, 2007, email set forth in ¶ 15 below), Robin McClure sent the following undated email to Respondent:

> I wanted to send you another copy of this email. I made two grammar mistakes that I needed to change anyway!
>
> This email contain some important items for your home.
>
> These are costs to build your home.

- Utility will add approximately 115.5 sq ft (main level 1944 total), basement 1944 sq ft with a total of approx. 3888 sq. ft.
- At $400k, that is less than $103 sq ft. Now if you change the floor plan or whatever you decide to do, it isn't going to effect the price per sq ft much one way or another (plus or minus a toilet and sink) as long as we keep from moving the roof.
- $165 sq ft for 1944 sq ft = $320,760, which with the estimates or bids we have received is not going to happen.
- Cost for structure to be built as the plans read (original) w/ an unfinished basement.
  - Allowances: for main level
    - $11,000 allowance for appliances, to include: dishwasher, gas cook top and oven, hood, refrigerator, washer & dryer, freezer;
    - $22,000 (L & M) allowance flooring and wall tile.
    - $3,500 for lights
    - total allowance amount $36,500
    - cost (not including allowance) $339,200 ($375,700 total before basement is completed) The allowance is for you to spend as you like, but anything over and it is on you. I gave you big allowances.
- Costs to finish basement. $10,000 allowance for flooring and lighting fixtures
  - $30 sq ft to include 3 egress windows and no other windows or natural light source during the new construction phase.

4

o Frame, rough-in plumbing and electric, insulate, drywall, mud, tape, texture, paint, trim cut, finish bathroom, lighting for basement, and flooring completed for $58,500.

Thanks for reading this and when you have a couple minutes . . .

Robin

p.s. Do you by chance have the contract?

LWS-113.

15. Respondent's next written communication to the McClures was an email dated July 8, 2007, two full months after Robin McClure's submission of a draft contract:

John and Robin: Hello and I hope this finds you well. I called to discuss this matter but could not reach you. I am attaching the latest version of the contract. I have reviewed Robin's email to me, which is undated but was from quite some time ago, and I have to say I am confused. I had not previously read the email. So, let me lay out my understanding (and hopefully we are on the same page.)

1. Before I purchased the lot, we discussed the cost of building a house of approximately 3600 square feet, which included a finished basement, I wanted the house to be built for approximately 350k, including lot costs. Using numbers from the web program to which you have access, cobsupply.com, you shortly advised me that 350 was not going to work.

2. At that time, it was discussed that the house could be built for some figure under 400k, and that included the cost of the lot and the finished basement. I advised at that time, that I was still hoping to bring the home in under 400k. These conversations occurred before I purchased the land and happened on several occasions, mostly in your kitchen. You advised, based on the cost to build budget from cobs homes that the home could be built for 400k or less and this included the lot cost of 65k and the finished basement. In reliance on these costs, I purchased the lot.

3. I have a copy of the cobs supply cost to build (CTB) estimate and it shows a total price, including the lot price of 65k, at $370,944.00. That number includes the basement.

4. If you deduct the lot costs of 65k from the "worst case build cost scenario" of 400k, that leaves 335k to build the home. *That is the number that I have inserted in the contract.*

5. As I have mentioned on several occasions, this number is actually in excess of what I wanted to spend, but is the number I am willing to spend.

6. Now, having Read [Sic] Robin's cost email, I am confused and concerned. Frankly, I don't understand the email, but one clear interpretation I can make from it is that the main level is going to cost $375,700 without the basement. That is unacceptable to me and totally at odds with our earlier discussions.

7. I am expecting the total cost to build, including the basement, to be 335k (meaning the total cost including the lot is 400k). That is more than we originally discussed and was discussed as a worst case scenario.

8. If the house as contemplated – fully built with basement finished – is going to cost more, I simply cannot proceed.

I certainly hope I am misreading Robin's email. Having said that, I have to say that I have proceeded with the understanding gained from our many conversations that discussed a total cost of 400k or less. My notes also reflect that we did discuss a Sq. foot build cost of approximately $97 to $110, at the same time; which could be inconsistent with a total cost of 400k, including the land. Because, if you assume 3800 square feet of build, then the cost of the home alone and without the land is 418k. Having said that, my notes reflect that the square foot build costs numbers include the land. I guess there exists some confusion there. My note further reflect that John indicated square foot build costs for the basement would be less.

Bottom line, I need to make sure we are on the same page. If we are, I would like to get the contract signed and have MCB start the project right way. If we are not, then I/we need to reassess. If I read Robin's email correctly, I cannot afford to build the home as I want it built. I suppose there are options, such as not finishing the basement right away, but that is not how I was proceeding. Another option is for me to look at buying a home already built. I don't want this email to convey any ill-will or ill-feeling, because that is certainly not the case with me. I would appreciate your calling me ASAP or responding to this email ASAP, because I do want to know where the construction project stands, if at all. In the meantime, I indicated you should go ahead and excavate the hole.

6

When I said that, I said so with the 400k total price understanding. If that is correct, go right ahead and excavate. IF not, please hold tight until we get this sorted out this week. Remember that I am in trial the next three days, but will be working at night. Thank you both and I look forward to hearing from you.

BC-5 (italics supplied).

16. The McClures responded with the following email dated July 9, 2007:

It seems we now have your attention. We need 1 – 2 hours of face to face, uninterrupted time with you before Friday. We know that you are busy, but it is imperative that we clear up any confusion to date. At the end of this meeting everyone will know which direction we are going. We can meet pretty much any time that is convenient for you.

BC-6.

17. Respondent by email later that day:

Hi guys. Before we meet, please let me know your position in writing. My week is jammed, as usual, and if you give me your position in writing it will expedite the process. Thanks much. Will call later.

BC-6.

18. The McClures responded by email later the same day:

Our position is to show you every hard cost and estimates that we have receive [sic] by our subs and suppliers. We will then show all of the related labor costs for this project and how we arrived at them. We feel that we have treated you fairly in the past and have no intention of taking advantage of you now. That is why it would be a huge benefit to meet face to face. We have every intention on building your house on the lot that we sold you. That was always our intention when we sold it to you. Time is of the essence at this point. Please let us know when you can talk about this and we will clear our schedule for you. We're cool.

BC-6.

19. Respondent responded three days later with an email dated July 12, 2007:

7

Hello. I left a message with John's cell. I can meet today around 4:00 or tomorrow morning, first thing. Let me know if either of those work for you.

BC-6.

20. Robin McClure responded with an email later the same day:

It won't be today because John is setting trusses. As for tomorrow morning, that may work. I have a doctor's apt early afternoon tomorrow, so we would need to be gone in fairly good order. I know we said that we could work around your schedule, but when we didn't hear before now I didn't cx my dr apt. and John had to keep moving forward. Of course we know that you have been busy, but we haven't let the grass grow under our feet either. Are you here this weekend, like Saturday morning? Just throwing it out to check.

Thanks for getting back to us. John did say that he had a message from you, but he said that you said you were going to call me. Email is just fine.

BC-6.

21. Respondent responded by email the same day:

Robin, how about 7 am. I have to leave for court at 11:00 tomorrow and will be gone rest of the day. 7 will work fine for me, however.

BC-6.

22. The next communication between the parties was an email sent July 15, 2007, to Respondent from Robin McClure:

Laurence:

Are you good for tomorrow? We need approx. 1.5 to 2 hrs to lay this thing out. We could try to do lunch plus some more time. We have everything right there for you to see. Let us know one way or the other.

BC-6.

23. Respondent responded with an email the following morning, July 16, 2007:

8

> Hello Robin. Just back in town. Spoke with John and will be at your house at 3pm. No plans past that so we can take as much time as needed. Thanks.

BC-6.

24. Robin McClure responded by email later that morning:

> Great...we will see you then.
>
> Have a wonderful day.

BC-6.

25. From there, the parties' recollections diverge. The McClures do not recall that a meeting ever took place; nor do they recall any further discussion about building a house for Respondent on Lot 10. The McClures testified that they were busy with several projects and could not wait any longer on Respondent. Respondent testified that the meeting occurred and that there were further discussions and perhaps emails (which are not in the record).

26. The parties do, however, agree on several subsequent facts. The McClures provided Respondent with a written "Estimate Proposal" dated July 15, 2007, which compiled the bids the McClures had received from suppliers and subcontractors to construct the house for Respondent. The Estimate Proposal (BC-7) indicated a total cost to build of $403,758.76. The McClures testified that this price included a finished basement, though Respondent's handwritten notes on the Estimate Proposal included a note, "DOES NOT HAVE FINISHED BSMNT." The parties also agree that no contract to build a house on Lot 10 was ever reduced to writing. In terms of documentation, the last communication in the record on the subject is Robin McClure's July 16, 2007, email set forth in ¶ 24 above. Nothing in the record indicates any rancor or hard feelings on either side. It appears that both sides merely went along with their lives and businesses. Respondent even performed subsequent legal services for the McClures.

27. Though Respondent cannot recall when he began looking for another house to purchase, the record indicates that he closed on the purchase of a home at 1413 Hillcrest Drive in Cody on February 8, 2008, where Respondent resides today. BC-10.

28. Lot 10 contains a drainage ditch running along the back of the property. During the summer of 2007, after Respondent purchased the lot, the ditch overflowed and spilled water onto Lot 10. As indicated above, the McClures resided next to Lot 10 at the time. The McClures were concerned the water would reach and jeopardize an electrical transformer that sits in the middle of Lot 10. John McClure testified that when he observed the flooding on Lot 10, he talked with Respondent and proposed to have a dirt subcontractor haul some fill dirt onto Lot 10 and use the fill to restore the berm to keep the ditch from flooding. John McClure claims Respondent said, "Do it." Respondent does not recall the conversation.

29. It is undisputed that John McClure engaged A2Z Excavation to haul fill dirt to the lot and restore the berm. A2Z Excavation sent the McClures an invoice for the work dated August 13, 2007, in the amount of $486.50. The McClures sent a copy of the invoice to Respondent, who paid it without complaint. The A2Z Excavation invoice indicates "Fill Hauled to Ina Ave" and includes charges for a truck (apparently, to haul the dirt) and a Bobcat (apparently to restore the berm). BC-8.

30. The evidence shows that Respondent neglected to maintain Lot 10 after he purchased the property in the spring of 2007, as required by Cody City Ordinance and by the Covenants, Conditions and Restrictions applicable to the Meadows Subdivision. For three summers (2007, 2008 and 2009), John McClure maintained Lot 10 for Respondent because the McClures considered Respondent a friend and wanted to be good neighbors. John McClure testified that maintenance of the lot required cutting the weeds two or three times each summer

10

and picking up trash that blew onto the lot. John McClure testified that during this period he spoke several times with Respondent about Respondent's responsibility to maintain Lot 10, but Respondent denied such conversations took place.

31. During 2007, 2008 and 2009, Respondent continued at various times to provide legal services to the McClures and their business. From September 2008 to July 2009, Respondent represented the McClures in a lawsuit brought by JL Engineering, LLC, against McClure Custom Builders, Inc., in Circuit Court in Cody. The lawsuit involved a dispute over a portion of the bill for engineering services provided by a subcontractor on one of the McClures' construction projects. The case went to a bench trial before Circuit Court Judge Bruce B. Waters in May 2009, with Respondent representing the McClures at the trial. A judgment in the amount of $4,045.00 was rendered against the McClures, which the McClures subsequently paid. The legal fees paid to Respondent for representing the McClures in the matter exceeded $2,000.00. BC-11.

32. Robin McClure testified that after the JL Engineering trial, she went to Respondent's office to retrieve the files relating to the case. According to Ms. McClure, she entered Respondent's office building, which is a two-story house on Rumsey Avenue in Cody, and proceeded up the stairs to Respondent's office, where she and her husband had met with Respondent on prior occasions. The files Ms. McClure was retrieving were contained in a plastic bag on a chair in Respondent's office. According to Ms. McClure, she picked up the bag and left Respondent's office, with Respondent walking her out. Ms. McClure claims as she left his office Respondent casually mentioned that he had put something in the bag for Ms. McClure.

11

33. Respondent denies that Ms. McClure ever came to his office to pick up the files from the JL Engineering trial. Suzie Foote, Respondent's former assistant, testified that Respondent only met with clients in the office conference room. Foote stated it is the office's custom and practice to mail files to a client with a cover letter effectively closing out Respondent's legal representation of the client or for the staff, at the client's request, to prepare the file and provide it to the client when the client picks it up from the office. Foote testified that she likely mailed the files to the McClures in accordance with the office procedure. (Tr. 478-489; 494.)

34. Ms. McClure testified that she did not look in the bag she obtained from Respondent immediately when she picked it up from his office, but she returned to her home, placing the bag on its side on the kitchen counter. When she did look in the bag, Ms. McClure claims a paperback book slid out of the bag. The title of the book was *A Straight Girl's Guide to Sleeping with Chicks*. Ms. McClure testified that the book was very upsetting to her. That evening, after she told her husband what had happened, the McClures decided to discontinue using Respondent's legal services. The McClures testified that they did not communicate that decision to Respondent, as they no longer wanted to have any contact with him.

35. Respondent denied that he gave Ms. McClure the book and said he believes Ms. McClure fabricated the testimony about the book to embarrass him and prejudice the Board against him.

36. The Board was puzzled by the testimony concerning the book. Respondent's motivation for placing the book in Ms. McClure's bag was unclear. Further, Ms. McClure's claim she had free access to Respondent's office and her description of Respondent's office was

12

inconsistent with the testimony of Respondent's assistant and Respondent's description of his office. (Tr. 481; 486-7; 778-80; 850-52.)

37. Respondent sent the McClures the following letter dated August 19, 2009, regarding *JL Engineering, LLC et al. v. MCB, Inc., et al.*:

> With the recent entry of Satisfaction of Judgment, we have no further business in this matter, therefore I am closing my file, the contents of which have been sent to you under separate cover. It was a pleasure representing you in this matter, although I know we all desired a different outcome.
>
> Thanks again, Robin and John. I hope that you will contact Bonner Stinson, P.C. for your future legal needs as well as pass along our name to anyone whom you feel might benefit from our services.

BC-13.

38. In conjunction with their decision to discontinue Respondent's legal services, in the latter half of 2009 the McClures decided to stop maintaining Lot 10 for Respondent. At that time, the McClures began complaining to the City of Cody regarding Respondent's failure to maintain the lot, as required by the Cody City Code. Those complaints continued during 2010 and 2011.

39. The first documentation in the record regarding the McClures' complaints to the City of Cody is a letter from Respondent to Officer Duane Wiener, the City's Community Service Officer, dated November 19, 2009:

> Dear Officer Wiener:
>
> This letter follows our several telephone conversations regarding Lot 10 of the Meadows Subdivision. You have advised me that conditions on the lot constitute a nuisance; specifically, weeds on the lot. Following your contact with me, I viewed the lot. I disagree that conditions on the lot constitute a nuisance. The lot condition appears consistent with the condition of surrounding unimproved lots. The east side of the lot does have foliage that is

13

grown beyond other areas of the lot. The cause of this appears to be watering by neighbors to the east, John and Robin McClure.

I have reviewed the Cody City Code regarding nuisance and note that the conditions of the lot do not meet the definitions of public nuisance. I have agreed to remove the growth on the east side of the lot, but that growth will return so long at the neighbors to the east continue watering Lot 10. Sadly, Lot 10 has been the source of much acrimony between the McClure's [sic] and myself and the reporting to you of an alleged nuisance appears to be a continuation of that problem. I have no control over the watering of Lot 10 by the McClures and I ask that you take up that issue directly with them. I did call and speak with John McClure to attempt to address the problem, but he was uninterested in having a civil conversation about the matter.

Please contact me with any questions or to discuss. Thank you.

BC-14.

40. The following year, on July 14, 2010, the McClures complained again to Officer Wiener about the condition of Lot 10. Officer Wiener inspected the lot and sent an abatement letter to Respondent which required Respondent to remove the weeds growing on Lot 10 within 15 days. Officer Wiener re-inspected Lot 10 on July 27, 2010, and noted that the weeds had been cut. BC-15.

41. The following year, on April 13, 2011, John McClure complained to Scott Kolpitcke, attorney for the City of Cody, about the condition of Lot 10. Kolpitcke contacted Officer Wiener, who inspected the lot and prepared a report regarding his findings, noting, "This property has been the subject of other complaints for nuisance. . . . On 4-14-11 took five pictures of it's [sic] current status and attached them to this report. There are weeds from previous growth which had been cut last year, and some tumble weeds along the north fence. At this time I do not see this property as a nuisance. The City Attorney has been notified of my finding." BC-16.

14

42. On April 19, 2011, Respondent retained Cody attorney Cole Bormuth to prepare the documents necessary to create a Wyoming limited liability company, New Delhi Trading Co., LLC. BC-17.

43. In early May 2011, with the assistance of Mr. Bormuth, Respondent organized New Delhi Trading Co., LLC, a Wyoming limited liability company (hereinafter, "New Delhi"), with Respondent as the sole member and operating manager. BC-18.

44. On May 6, 2011, Respondent assigned his interest in Lot 10 to New Delhi via a written "Assignment and Assumption" which identified Respondent as assignor and New Delhi as assignee. BC-18, p. LWS 0142. The Assignment and Assumption provided, in pertinent part:

> Assignor hereby assigns all of his right, title, and interest in and to the purchase agreement, the warranty deed, the transaction, and any and all claims, lawsuits, demands, and any and all other matters in and to Lot 10 of the Meadows Subdivision, as located in Book "G" of plats, page 112, according to the records of the County Clerk and Recorder of Park County, State of Wyoming, to Assignee.

Respondent also conveyed Lot 10 to New Delhi via a warranty deed. BC-19.

45. On June 14, 2011, Scott Kolpitcke, attorney for the City of Cody, spoke with Respondent about the condition of Lot 10, which had again become overgrown with weeds and trash and that another nuisance letter may have to be sent to Respondent demanding clean up of the property. Respondent told Mr. Kolpitcke that he would clean up the property by the weekend and that another nuisance letter was not necessary. BC-20. Kolpitcke testified that Respondent was visibly angry when Kolpitcke told him that the McClures were again complaining to the City about the condition of Lot 10. (Tr. 87.)

46. On June 15, 2011, Respondent filed a complaint in the Fifth Judicial District Court, Park County, Wyoming, styled *New Delhi Trading Co., LLC, Plaintiff, vs. John McClure, Robin McClure, and McClure Custom Building, Inc., Defendants*, Civil Action No.

15

26640 (hereinafter, the "New Delhi Lawsuit"). The complaint (BC-23) against the McClures alleged, among other things:

a. New Delhi obtained Lot 10 "and any and all rights, benefits, or burdens as against Defendants by full assignment of the original purchaser." Nowhere in the complaint did Respondent identify himself as the original purchaser.

b. "In February and March 2007 Plaintiff and Defendants started negotiating for Defendants to build a home. Defendants offered to sell the real property to Plaintiff for the purposes of home construction on the property. The real property was then owned by Defendants."

c. "Defendants repeatedly represented that the total cost to build the property and purchase the land would be $400,000.00 or less."

d. The agreement to purchase Lot 10 for $65,000.00 "was contained within, and part of, the larger agreement for Defendants to build a residence on the property. This agreement was express as well as implied." Notably, the complaint failed to mention the written Purchase Agreement for Lot 10 that disclaimed verbal agreements beyond the terms of the written Purchase Agreement.

e. "In reliance on Defendants' representation that the real property and the home to be built upon the real property would inclusively cost $400,000.00 or less, the land was purchased for the $65,000.00 demand price set by Defendants. The real property was purchased on April 26, 2007. Per agreement, this left $335,000.00 remaining for complete build of the home."

f. "After the real property was purchased, Defendants then advised Plaintiff that the cost to build solely the main level of the home was going to exceed $335,000.00.

16

Defendants also advised that, despite earlier representations, Defendants were unable to then provide a firm cost. Defendants attempted to switch the previous agreement from a firm land and build price of $400,000.00 or less to a time and materials price for the home."

g.      "Defendants clearly and purposefully represented that the home, including real property, could be constructed for $400,000.00 or less. Defendants, as professional homebuilders, knew or should have known that either 1) they lacked sufficient knowledge and skill to make such a representation; or 2) that such a representation was false."

h.      "Defendants at no time advised Plaintiff of their lack of skill. In fact, Defendants always maintained they were capable of quality building at such a price. Defendants never advised Plaintiff that such a representation was false. Defendants never advised Plaintiff, prior to formation of the contract, of an inability to perform the contract by Defendants."

i.      "After advising that they would not perform the contract as negotiated, Defendants did not offer to repurchase the land or otherwise compensate Plaintiff for the breach of contract."

j.      "Further, after advising that the home could not be built for or below the quoted $335,000.00, Defendants billed for services not authorized by Plaintiff; namely earth moving and lot grading." This allegation, apparently referred to the A2Z Excavation invoice described in paragraph 29 above.

k. "On multiple occasions Defendants, and specifically Defendant John McClure, has called law enforcement to complaint that the property condition constituted a nuisance."

l. "Defendants, and specifically the conduct of John McClure, constitutes a purposeful and willful course of harassment."

m. The damages claimed to have been suffered by New Delhi "which exceed $85,0000.00" [sic] were (1) the cost of Lot 10; (2) real property taxes and homeowners' assessments for Lot 10; (3) "loss of opportunity and use of money used to purchase the real property"; (4) "Time spent maintaining and dealing with the property"; (5) "Monies paid to Defendants for unauthorized work;" (6) interest on the purchase price of Lot 10; and (7) damages for harassment "to be determined at trial."

n. Respondent asserted the following legal theories: (1) rescission; (2) breach of contract; (3) misrepresentation; (4) promissory estoppel; (5) "actual fraud"; (6) harassment; and (7) punitive damages. BC-23.

47. Though Respondent filed the complaint on June 15, 2011, he did not cause the summons to be issued until August 10, 2011. BC-24.

48. On June 25, 2011, Officer John Verderame (who succeeded Officer Duane Wiener as the City's Community Service Officer) performed a follow-up inspection of Lot 10 and noted that nothing appeared to have been done about the weeds and trash on the lot. Officer Verderame reported his findings to City Attorney Kolpitcke, who asked Officer Verderame to issue a nuisance letter to Respondent. Officer Verderame re-inspected Lot 10 on July 1, 2011, and reported:

> On Friday, July 1, 2011, I re-visited the Stinson property, and it
> appeared that the weeds had been trimmed and much of the trash

18

had been cleaned up. I sent an email to Scott Kolpitcke to see if he felt that we needed to continue with the nuisance letter now, and he responded saying that he felt that we did not. He said that John McClure had contacted him and said that Laurence Stinson had cleaned up the property and thanked us for our efforts.

BC-21.

49.     The McClures first received notice of the New Delhi complaint via a letter from Respondent dated July 19, 2011:

> Enclosed find a copy of a Complaint filed in the 5th Judicial District Court, Cody, Wyoming, against you and your company. Of course, you know why you have been sued. Prior to filing your answer to this Complaint, New Delhi Trading Co., LLC is willing to accept – in compromise and full and final satisfaction of any and all claims against all Defendants – payment of the purchase price of the property plus taxes and assessments paid since purchase. Also to be included, is the cost paid for unauthorized dirt work on the property. This amount is approximately $71,000.000. In exchange, Plaintiff will re-deed the land to you, or an entity of your choosing. If the case proceeds to trial and Plaintiff prevails, which I expect likely given your conduct and the documentation, then Plaintiff will recover these amounts plus 10% interest per year, damages for fraud, damages for harassment and damages for loss of opportunity. This moment is your least expensive opportunity to resolve the matter.
>
> I encourage you to consult with counsel to advise you in this matter. If you are interested in early resolution please contact, or have your counsel contact, Steve Simonton at 307.587.7010. Mr. Simonton will be handling the details of any early resolution. If you decline early resolution and do not contact Mr. Simonton within the next 20 days, Plaintiff will proceed with the suit.

BC-22.

50.     The McClures testified that they were shocked to receive Respondent's letter. They immediately concluded that it was in retaliation for their complaints to the City about Respondent's refusal to cut the weeds on Lot 10. Upon receipt of Respondent's letter and the New Delhi complaint, the McClures retained Cody lawyer Michael LaBazzo to advise them. There followed several weeks of settlement discussions, with LaBazzo urging the McClures to

19

make an offer to settle the lawsuit by repurchasing Lot 10 from Respondent as a "business solution" to the financial burden posed by the New Delhi Lawsuit. The McClures authorized LaBazzo to contact Mr. Simonton, and offer $40,000.00 for Lot 10. LaBazzo communicated the $40,000.00 settlement offer to Mr. Simonton on or about August 1, 2011. BC-69, p. OBC 278.

51.    On August 10, 2011, Respondent caused the summons to be issued. Service of process was obtained upon Robin McClure on August 12, 2011. BC-24.

52.    On August 17, 2011, Mr. Simonton wrote to LaBazzo:

> This is to follow up on your call on behalf of the McClures. In that call, you mentioned that they were interested in settling Laurence's claim by paying Laurence Forty Thousand Dollars ($40,000.00) for the real property they sold him.
>
> Laurence paid the McClures $65,000.00 for the property. I do not recall you mentioning the reason the property has been devalued by $25,000.00 in the short time Laurence has owned it. There was also no mention about the other out-of-pocket expenses Laurence incurred. These are expenses that are well known to the McClures. They include such things as the homeowners' association assessments, property taxes, maintenance fees, and the cost of the blueprints generated pursuant to McClures' agreement to build the home. As Laurence mentioned in his letter, these costs total approximately $6,000.00. That is why he proposed to settle the dispute for the $71,000.00 out-of-pocket expenses he incurred in consideration of the agreement with the McClures to build a house on the land they sold him. His proposal presumed a transfer of the property back to the McClures in exchange for payment of the $71,000.00.
>
> Laurence is certainly willing to negotiate in good faith to resolve this unfortunate dispute. It should be clear to the McClures that negotiating in good faith will benefit them in the long run as well.
>
> Both you and the McClures are aware, I am sure, that a lawsuit like the one Laurence filed will generate more attorney fees than the amount in dispute justifies. You know, too, that the actual cost to McClures of Laurence's proposal is negligible now because they actually get the property back for the price they sold it, plus paid up HOA fees, property taxes, maintenance fees and a nice set of blueprints for their next client or a spec home. Under that proposal, they lost nothing. Likewise, Laurence gains nothing.

Both parties are placed back where they were before the transaction.

On the other hand, if the McClures choose to continue to low ball a settlement as reflected by the $40,000.00 offer, there will be no settlement. If they do not win in litigation, they will have substantial attorney fees, costs and the requirement to pay a judgment in an amount between $71,000.00 and $90,000.00. Clearly, their risk of loss incident to this case could well exceed $110,000 with attorney fees.

I mention the downside of the McClures' strategy to low ball a settlement because I am hopeful that with your litigation experience, you might confirm for them the need for the McClures to negotiate in good faith. Certainly, seeking a $25,000 profit on this failed transaction at Laurence's expense is impossible for him to entertain.

With the sincere desire to bring this matter to a prompt and inexpensive settlement for everyone, Laurence has authorized me to counteroffer the sum of $70,000. He is willing to continue to negotiate but only if the McClures' next offer is at least $60,000.

I hope you will agree that a settlement where neither party loses money is much better than a full-scale litigation where at best, both parties lose significant litigation costs, and at worst (for your clients), the Court grants rescission and return of the purchase price paid and the other damages which Laurence is seeking. It is clear that they have nothing to gain by litigation and much to lose. It is a win/win for both if the various disputes are amicably and fairly settled.

Please discuss this matter further with the McClures. I hope we will be able to then discuss settlement proposal that have a likelihood of success at the least expense.

BC-25.

53.     The McClures were outraged by the New Delhi Lawsuit and communicated to LaBazzo their intention to file a grievance against Respondent with the Wyoming State Bar. On August 23, 2011, LaBazzo sent an email to the McClures which included the following discussion of the ethical implications of the New Delhi Lawsuit:

21

Per our discussions yesterday I have called and written to Simonton requesting a face to face meeting with him and his client. At the meeting, I will discuss Lawrence's legal representation of you at the time of the alleged transaction, without the required waiver and release of conflict of interest signed by you. In addition, you should have signed an acknowledgement that you were waiving your right to have another attorney review the alleged agreement and advise you on its fairness per our ethical rules. Finally, any business agreement between an attorney and his client must be in writing specifying the terms and conditions of said business arrangement. If LS does not want these violations reported to the State Bar for investigation, we need to reach a settlement of the litigation. In addition, I will discuss both the lack of merit of the legally nonexistent "harassment" cause of action and the fact the NO agreement whatsoever could have been entered into with the Plaintiff LLC, that did not even exist until 4 years after the supposed agreement was entered into. Rule 11 sanctions are available for recovery of your attorneys [sic] fees in both instances.

BC-27.

54. On August 31, 2011, Officer Verderame issued another nuisance letter to Respondent giving him 15 days to cut the weeds on Lot 10. Officer Verderame re-inspected Lot 10 on September 10, 2011, noting, "[U]pon returning to check on the property, I saw that the weeds had been cut down, although not cleaned up and some were strewn on the sidewalk. I took photos and closed this case." BC-26.

55. Settlement negotiations continued between LaBazzo and Simonton, with the two attorneys exchanging offers and counteroffers from August to November 2011. *See* LWS-87 through LWS-95. At some point, LaBazzo and Simonton agreed that Stinson should draft a settlement agreement containing the terms upon which LaBazzo and Simonton had agreed. *See, e.g.,* LWS-80.

56. In December 2011, a "Mutual General Release and Settlement Agreement" prepared by Respondent was submitted to LaBazzo. Although the original draft is not in the

record, its contents can be gleaned from a "redline" (*i.e.*, edited) draft prepared by LaBazzo and emailed to Respondent on December 27, 2011. BC-31, p. LWS-540 (and BC-85).

57. A poor copy of LaBazzo's redline draft was received into evidence as Exhibit BC-85. Though difficult to read, it appears that LaBazzo's redline draft removed the following provision that had been proposed by Respondent in the original draft:

> Releasees [the McClures] do further and forever release and discharge Releasor's sole member, Laurence W. Stinson, from any and all actions, claims, complaints, bar complaints, grievances, causes of action, demands, or expenses for damages or injuries, whether asserted or unasserted, developed or undeveloped, known or unknown, foreseen or unforeseen, arising from the lawsuit or any interactions or dealings between Releasees and Laurence W. Stinson.

BC-85, p. 2.

58. LaBazzo's redline draft proposed other changes to Respondent's first draft, including adding Respondent as "releaser" in addition to New Delhi. LaBazzo testified that he proposed this change in order to assure that the New Delhi Lawsuit would not be settled only to have Respondent bring similar claims in his own name afterwards.

59. Prior to the introduction of Exhibit BC-85 by Bar Counsel, Respondent testified as follows regarding his original draft of the release:

> I think I need to talk about the request for - - or, the dismissal a little bit. There wasn't an attempt on my part to improperly insert myself in the dismissal document. Initially when I sent the original dismissal document to Mr. LaBazzo, it did not contain me. And the reason it did not contain me is the case was New Dehli Trading v. McClure.
>
>    ***
>
> At no point did anyone ever explain to me or tell me or communicate in any way that this release should be returned to just New Dehli and the McClures or that I individually was the problem, nor was I told that the problem is [the McClures] want to grieve me to the bar and they think this release will prohibit that.

23

(Tr. 626-27; 629.)

60. The Board finds that Respondent was not truthful in his testimony concerning Exhibit BC-85. Exhibit BC-85 clearly shows that Respondent's first draft of the settlement agreement contained an express release by the McClures of all claims against Respondent, including specifically bar grievances.

61. On January 17, 2012, Respondent sent an email in response to the LaBazzo's December 27, 2011, email transmitting LaBazzo's redline draft of the settlement agreement:

> I have been occupied with federal court matters and I have time today and tomorrow and I am hoping to wrap up this agreement. I have attached what I believe will be an acceptable final. I accepted your changes adding me, individually, directly into the release.
>
> ***
>
> I am going to assume my proposed changes are acceptable and deliver the release and the minutes [of New Delhi approving the settlement] to your office later today. I know that will not likely afford you the opportunity to discuss this matter with your clients, but these changes are not likely objectionable *and if they are, we can revisit this release language*. I propose that I pick up the [settlement] check on Monday. Please let me know if this will work for you and your clients.
>
> NOTE THAT THE FORMATTING ON THE SIGNATURE PAGES IS OFF, THIS HAS SOMETHING TO DO WITH THE TRANSITION FROM YOUR RTF FORMAT TO MY DOCX FORMAT. I WILL CORRECT THAT ON THE DELIVERED COPY.

BC-31, p. LWS 0539 [italics supplied]. Respondent's revised draft, which accepted all of LaBazzo's redline changes and contains the referenced formatting problems on the signature page, was received into evidence as Exhibit BC-28.

62. LaBazzo responded the same day:

> I have forwarded your email and attachment to the McClures. I will let you know their response asap.

24

BC-31, p. LWS 0538.

63.    Respondent responded as follows:

> Thank you, Michael. *I will hold off delivering a signed copy until tomorrow morn; to learn if the McClures have any concerns with the changes.*

BC-31, p. LWS 0530 [italics supplied].

64.    The next day, Wednesday, January 18, 2012, LaBazzo sent the following email to Respondent:

> I just received an email from the McClures, who informed me that they will not be able to review the matter and respond until next week. I am in Billings in a mediation Monday and Tuesday, but will have plenty of time to respond, while Judge Downes is with the other side.

BC-31, p. LWS 0529.

65.    On Thursday, January 19, 2012, Respondent sent the following email to LaBazzo:

> Michael, I am guessing the McClures wanted to wait a bit and they had to wait for me these past two weeks so I understand. Wanting to keep this moving, however, I will drop fully executed originals by your office Monday. Then you can have the McClures sign those originals *or get a hold of me if there is a problem.* I know the recent delay is mine; still, we should be able to wrap this up next week.

BC-31, p. LWS 0527 [italics supplied].

66.    When the McClures reviewed Respondent's amended draft of the settlement agreement, they objected to the following provisions, as they were concerned that they would have the effect of precluding a bar grievance against Respondent:

> **MUTUAL RELEASE:** * * * In consideration of dismissal of the lawsuit and the forbearance of attempts for collection of other monies or the making of other allegations, Releasees [the McClures] do fully and forever release and discharge Releasors [Respondent and New Delhi], Releasors' heirs, personal

25

representatives, successors, assigns, agents, officers and directors, from any and all actions, claims, causes of action, demands, or expenses for damages or injuries, whether asserted or unasserted, developed or undeveloped, known or unknown, foreseen or unforeseen, arising out of the described lawsuit or any prior interactions or dealings between Releasors and Releasees.

\* \* \*

**CONFIDENTIALITY AND NO ADMISSION OF LIABILITY:** \* \* \* Releasees and Releasors shall treat this settlement, and the facts and circumstances of the lawsuit, as generally confidential and shall not discuss the lawsuit or the settlement with any person or entity, save their lawyer representing them herein and their accountant or tax preparer. If asked any questions by any persons other than their lawyer for this case or their accountant or tax preparer, the parties shall cite this confidentiality clause and decline further comment.

**NO ADDITIONAL CLAIMS OR COMPLAINTS:** Releasors and Releasees represent that no additional claims or complaints are contemplated against the other. In the event an additional claim or complaint is made which directly or indirectly results in additional liability exposure to Releasors or Releasees for the losses, injuries and damages for which this Release is given, each covenants and agrees to indemnify and hold harmless the exposed party from all such claims and complaint.

*See* BC-28, pp. 2-3. The McClures testified that they decided paying money to Respondent under the terms dictated by Respondent just to extract themselves from a frivolous lawsuit and end the incurrence of attorney fees, particularly if it might preclude them from pursuing a Bar grievance, was not something they were willing to do. (Tr. 161-62; 224.) The McClures resolved to hire another lawyer who was willing to fight Respondent.

67.    On Monday, January 23, 2012, LaBazzo sent the following email to Respondent:

The McClures have terminated my services in this matter. I will let you know to whom you should communicate in the future regarding the litigation, as soon as I hear from them. Please do not send any settlement documents to my office.

BC-31, p. LWS 0526.

26

68.    LaBazzo's announcement that the McClures had terminated his services commenced a series of emails, all on January 23, 2012, in which Respondent disclaimed his prior, express acknowledgments that the settlement agreement needed to be reviewed and approved by the McClures. First, Respondent responded with the following:

> Michael, thanks for taking my call this morning. I am unfortunately on the road again today I think and so had already asked my office to deliver the settlement documents to you this morning. I also sent Judge Cranfill a letter advising that the case has been resolved by settlement, and you were copied.

BC-31, p. LWS 0526.

69.    LaBazzo's response:

> Unfortunately, the McClures have not approved the proposed agreement and I would be surprised if they do. I will have [my assistant] return the document to your office if we receive it. I will let Judge Cranfill know the status when I see your letter.

BC-31, p. LWS 0526.

70.    Respondent's reply:

> Michael: I am surprised to hear that the McClures are attempting to back out of the settlement agreement, if that is what you are saying. The settlement agreement was negotiated between [Simonton] and you and the McClures were well aware of it. We have a done deal and an enforceable agreement.

BC-31, p. LWS 0525.

71.    LaBazzo's response:

> Good luck. Try reading my emails to you directly, wherein I expressly told you the agreement would need to be "reviewed and approved" by the McClures, who to my knowledge and testimony, if needed, have not done so yet. [My assistant] returned the documents, I told you NOT to deliver to my office, back to you.

BC-31, p. LWS 0524.

72.    Respondent's reply:

I understand you are in a tough position, now being a witness against your clients. I do not wish to make you a witness but its [sic] the McClures that have done that if they are not going to honor the settlement agreement. I expect you would offer your testimony that an agreement was reached and what was remaining was reducing that agreement to the final writing. The original agreement still stands. I do not know if there is really an argument, but your email makes it sound as if the McClures are not going to honor the agreement . . . or at the very least that is your suspicion. I want to be clear that I understand this to be the McClures [sic] doing and not yours; I know you would not tell a client to back-out on an agreement.

I sent the documents to your office, as I mentioned on the phone, before I received your email. It seems to me that you should still have a copy of the documents for your file, so I have had the office stick the documents in the mail to you, along with a copy of my letter to Judge Cranfill indicating that a settlement agreement has been reached. The letter to Judge Cranfill shows you have been copied and I want that to be so.

Am I reading your email correctly to say that you wish me to contact the McClures directly? I am going to assume unless you tell me different that the McClures are no longer interested in settlement, having settlement discussions, or finalizing the settlement. If they are, tell me. I am uncomfortable talking with them as you have been their counsel without this very express clarification.

I will wait until the end of the day to hear from the McClures. Again, I know first hand how hard it is to deal with the McClures and how logic seems to be the last thing on their minds. I can only imagine how hard it has been for you to try and control the frenzy of their emotion in this event. Thank you.

BC-31, p. LWS 0523.

73. The record in this matter includes Exhibit BC-32, a January 23, 2012, letter from Respondent to LaBazzo transmitting the settlement agreement, signed by Respondent, along with Special Minutes of New Delhi approving the settlement. Also in the record is Exhibit BC-33, a January 23, 2012 letter from Respondent to Judge Cranfill, which states in reference to *New Delhi Trading Co., LLC v. McClure, et al.*, Civil Action No. 26640:

I am writing to advise you that the above referenced matter has been resolved by settlement and that the dismissal documents are forthcoming.

*See also* BC-73, p. LWS 0193.

74. Respondent's January 23, 2012 letter to Judge Cranfill, in addition to being an improper *ex parte* communication, contains two significant misrepresentations: first, that the case had settled; and second, that the dismissal documents were forthcoming. Both statements were untrue and Respondent knew they were untrue when he made them.

75. On January 26, 2012, Respondent caused the following letter to be hand-delivered to the McClures:

> Dear Robin and John:
>
> I have been advised by Mr. Michael LaBazzo that you have terminated his representation. Further, Mr. LaBazzo thinks it unlikely you will sign the settlement documents. The last communication from Mr. LaBazzo was that you were not communicating with him at all. I am writing this letter to advise that you need to immediately culminate the settlement agreement or I will seek to enforce the agreement with the Court and, further, take any and all appropriate action to recover attorney's fees and protect the interests of New Delhi.
>
> By November 9, 2011, Mr. LaBazzo wrote to Mr. Simonton and stated that a deal was reached, excepting for one non-material term and proposed the term. Mr. Simonton spoke with Mr. LaBazzo on November 11, 2011 and agreed to Mr. LaBazzo's suggestion. At this point, all material and non-material terms of the contract were agreed. A full and final settlement was reached. The only remaining matter was to reduce the settlement to writing.
>
> You must advise me by the close of business today that you will honor the settlement and perform under its terms. If you do not, I will seek the court's order enforcing the settlement agreement. Mr. Simonton, a long-time and well-respected lawyer in this community, is prepared to testify that a settlement was reached. I will prevail in any motion to enforce settlement and, in so doing, will be awarded attorney's fees. This is the law of enforcing settlements in Wyoming. The lawsuit alleged your misrepresentation and, essentially, your failure to honor your

29

word. That you are not trying to avoid your legally binding promise to resolve this case affirming evidence [sic] of your willingness to say one thing and do another; I suspect the court will view such conduct dimly.

Unless you communicate to my office your unequivocal intent to honor the settlement agreement by the close of business today, it will be clear to me that you do not intend to honor your word and I will seek relief from the court.

BC-34.

77. Respondent's office emailed a copy of the foregoing January 26, 2012 letter to LaBazzo, who responded with the following email to Respondent:

As I have told both Mr. Simonton and Mr. Stinson at all times, my former clients, the McClures would need to review and approve any Settlement Agreement. To my knowledge, the McClures have never approved any draft Settlement Agreement I have received from either Mr. Simonton or Mr. Stinson.

BC-35.

77. The McClures filed a *pro se* answer to the New Delhi complaint on January 27, 2012. *See* BC-73, p. LWS 0218. The filing of an answer by the McClures activated Respondent's duty to provide the initial disclosures required by Rule 26(a)(1) of the Wyoming Rules of Civil Procedure, which required Respondent to produce the following "without awaiting a discovery request" within 30 days of the answer:

A. The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information;

B. A copy of, or a description by category and location of, all documents, electronically stored information, and tangible things that are in the possession, custody or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment;

C. A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered; and

D. For inspection and copying as under Rule 34 any insurance agreement under which any person carry on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

78. On February 3, 2012, Worland attorney John Worrall entered his appearance in the New Delhi Lawsuit on behalf of the McClures. At that time, Worrall sent the following letter to Respondent:

I am enclosing herewith my Entry of Appearance in the above referenced matter. Given the fact that an answer has been filed, I wanted to address the issue of Rule 26 Disclosures with you, and advise that my clients will be filing those in a timely way as I would expect that you will. A couple of things probably should be focused upon by you in your responses, which would include whatever document evidenced the transfer of this real estate to New Delhi Trading Company. The initial sale was to yourself, individually, during your divorce, so I guess I would probably also be interested in whether or not the existence of this asset was disclosed to your spouse. I don't want to have a potential circumstance where someone else shows up as a claimant in this matter, in addition to whoever else is properly here. First and foremost though, I am interested in whatever documentary evidence, if any, exists to support your claim that there was somehow an agreement to construct a residence at a set price. Lastly, your damage calculation would be appropriate.

I will look forward to hearing from you in the near future regarding these matters however, please don't take umbrage with the fact that I am trying to establish some initial disclosure parameters, but I did want you to know what I will be interested in. If those aren't provided in the initial disclosures, I will be propounding discovery regarding same. I just thought that we might save a little time and effort, if those things are provided to begin with. I will look forward to hearing from you or other Counsel if you decide to go that direction, in the very near future.

BC-37.

79. On February 7, 2012, Worrall filed a "Motion for Leave to Amend," seeking leave to add affirmative defenses to the *pro se* answer filed by the McClures a few days earlier, and also to assert a counterclaim. BC-73, p. LWS 0223. The proposed counterclaim attached to the motion alleged that the filing of the New Delhi Lawsuit "is primarily for purposes of harassment and infliction of emotion distress." BC-73, p. LWS 0227.

80. On February 27, 2012, Respondent filed an "Objection to Defendant's Motion to Amend," in which he stated that the parties had reached a full and final settlement, but "Defendants then fired Mr. LaBazzo – presumably as he would not cooperate in their plan to avoid settlement – and retained new counsel. Plaintiff will file a motion to enforce settlement." BC-73, p. LWS 0229. Of the McClures' proposed counterclaim, Respondent concluded, "[I]t appears Defendants are trying to vent, and not truly state a claim of merit." BC-73, p. LWS 0232.

81. On March 6, 2012, Respondent wrote to Mr. Worrall and advised that Lot 10 was being listed for sale "consistent with the settlement agreement." BC-38. On the same day, Respondent filed a pleading in the New Delhi Lawsuit entitled, "Plaintiff's Motion to Dismiss Its Eighth Cause of Action" which stated in its entirety:

> COMES NOW the Plaintiff, by and through counsel, and hereby moves the court for dismissal of its eighth cause of action for harassment. An answer has been filed pro se by the Defendants following a settlement agreement that is now in dispute. No additional discovery has taken place and the parties have yet to exchange initial disclosures.

BC-73, p. LWS 0233.

82. Mr. Worrall responded with a letter dated March 12, 2012, denying any settlement agreement and urging Respondent to file a motion to enforce same if he believed a

settlement was reached. Mr. Worrall concluded the letter, "I will expect, in the very near future, to receive your Rule 26 Disclosures in their entirety. I have previously written you about this matter and have told you what things I expect to see. I will look forward to your prompt reply." BC-39. As he had with Worrall's February 3, 2012, request for Rule 26 disclosures, Respondent ignored it and failed or refused to respond to Worrall's renewed request.

83.    On March 13, 2012, Worrall filed an "Objection To Plaintiff's Motion to Dismiss Its Eighth Cause of Action" in which he asserted:

> 1.  The motion alleges that a settlement had been reached in this case, which is not believed to be the case.
>
> 2.  If in fact a settlement had been reached, the entire complaint should be dismissed, however, Counsel for Plaintiff only seeks to dismiss one claim which is the subject matter of some pleadings that Defendants seek to amend and bring additional claims against Plaintiff.
>
> 3.  Because this matter has been served and answered, permission is required from the Defendants in order to dismiss any claim without a hearing.  No hearing has been requested and an order has simply been sent along with the motion.
>
> 4.  Until and if the Court decides that there either was or was not a settlement agreement, the motion is not even ripe for determination.

BC-73, p. LWS 0236.

84.    Two months later, on May 10, 2012, Respondent filed "Plaintiff's Motion for Hearing on Enforcement of Settlement Agreement," BC-73, p. LWS 0240, and obtained a May 30, 2012, setting for a hearing on the motion. BC-73, p. LWS 0244. On the same day, Respondent served a request for production of documents upon Worrall seeking the following:

> 1. Please produce, from December 1, 2006 to present, a search and record of all phone calls, or texts regarding LOT 10 of the Meadows subdivision from any phone in your control (personal, professional, your employees, and business computers) to and from Mr. Laurence Stinson.

33

2. Please produce, from December 1, 2006 to present, a search and record of all emails, and the contents of those emails, regarding LOT 10 of the Meadows subdivision sent from any computer (or email transmitting device) in your control (personal, professional, your employees, and business computers) to and from Mr. Laurence Stinson including, but not limited to, email address laurence@bonnerstinsonpc.net.

3. Please produce all hard copies and/or electronically stored information referencing, mentioning, or in any way related to LOT 10 of the Meadows Subdivision.

4. Please produce all hard copies and/or electronically stored information referencing, mentioning, or in any way related to settlement of this case.

5. Please produce, from December 1, 2004 to December 31, 2010, a search and record of all person employed by you including name, title, address, and telephone numbers.

6. Please produce a search and record of all persons known to you to have information regarding any attempt by you to buy or sell Lot 10 of the Meadows Subidivion.

7. Please produce a search and record of all contractors, subcontractors, materialmen, laborers, or others contacted by your regarding Lot 10 of the Meadows Subdivision, including the date, time, and substance of the contact.

BC-73, p. LWS 0352.

85.     Also on May 10, 2012, Respondent served perfunctory "Plaintiff's Initial Disclosures":

A. The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.

1. John McClure
2. Robin McClure
3. 30(b)(6) Representative of New Delhi Trading Co., LLC
4. Matt Weed
5. John Parsons
6. Stephen C. Simonton
7. Michael A. LaBazzo

34

8. Police Officer(s) from the City of Cody
9. Scott E. Kolpitcke
10. Contractors to be identified through the course of discovery
11. Sub-contractors to be identified through the course of discovery

B. A copy of, or a description by category and location of, all documents, electronically stored information, and tangible things that are in the possession, custody or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.

1. Buy/Sell Agreement between the parties.
2. Architectural drawing so [sic] of the property in dispute in this matter.
3. Correspondence between the parties.

C. A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

1. All damages as allowed by law if the settlement is not enforced.

D. For inspection and copying as under Rule 34 any insurance agreement under which any person carry on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

1. Not applicable.

LWS-22.

86. On May 17, 2012, Respondent caused subpoenas to be served upon the McClures requiring them to produce, no later than May 29, 2012, the same documents identified in the request for production of documents Respondent had served upon Mr. Worrall seven days earlier. The subpoena included the admonition, "Any disobedience will be punished as a contempt of said Court." BC-73, pp. LWS 0246-0254.

35

87. On May 25, 2012, Worrall filed a "Motion to Quash Subpoena and for a Protective Order," in which he asserted, "The sole purpose of this subpoena is to harass and unduly burden the Defendants, immediately in advance of a hearing on totally unrelated matters by making them do all of these things in a very brief period of time." The motion requested that the Court withhold any ruling on whether the discovery sought by the subpoena is proper until "after a decision is made on whether or not the case has been settled and the other issues such as the motion to leave to amend and add counterclaims and the motion to withdraw a count of Plaintiff's complaint." BC-73, p. LWS 0256.

88. On May 29, 2012, Respondent's assistant, Suzi Foote, emailed a letter to Mr. Worrall from Respondent which included the following: "When you and I spoke following the short scheduling hearing with the court, you advised that you believed your clients also felt the case settled and that you would advise whether we could conclude this settlement without court intervention. Please advise if your clients are going to honor the settlement." BC-40. Worrall responded with a prompt email to Respondent's assistant:

> Suzi: Please tell Laurence nice try but I never said my clients thought this case settled. I said I would speak to them and find out if they were interested since Laurence had again changed the terms. They are not. . . .

BC-41.

89. The hearing on Respondent's motion to enforce the alleged settlement agreement was held on May 30, 2012. Simonton and LaBazzo testified, along with the realtor who would have been involved with efforts to sell Lot 10 had the settlement been consummated. At the conclusion of the two hours allotted for the hearing, the matter was continued and later scheduled to conclude on July 16, 2012. BC-73, p. LWS 0270. In the interim, Respondent and Worrall came to an agreement that another hearing was unnecessary and that they would submit

the matter on briefs. As a result of that agreement, Respondent avoided having to testify at the hearing.

90. On June 15, 2012, Robin McClure complained to Officer Verderame about the condition of Lot 10. Officer Verderame inspected the property and issued a Notice to Abate Nuisance to Respondent. On July 2, 2012, Officer Verderame re-inspected the lot and found that the weeds had been cut down. BC-42.

91. On July 23, 2012, Worrall filed "Defendant's Final Argument in Respecting Motion for Enforcement of Alleged Settlement Agreement." BC-73, p. LWS 0271.

92. On August 22, 2012, more than three months after filing the motion to enforce settlement and more than nine months after the settlement was alleged by Respondent to have been reached, Respondent filed "Plaintiff's Written Closing Argument Regarding Motion to Enforce Settlement," along with an unedited transcript from the May 30, 2012, hearing. BC-73, p. LWS 0275. In his plea to the Court to enforce the settlement agreement, Respondent stated, "Defendants are banking on the idea and hope that this court will not enforce the agreement thinking that Defendants will sue Mr. LaBazzo for malpractice. . . . Defendants have engaged in very bad conduct and are continuing to operate without fixing their bad conduct." BC-73, p. LWS 0281.

93. On September 27, 2012, Judge Cranfill issued a decision letter denying Respondent's motion to enforce settlement and requested Worrall to prepare the order. Judge Cranfill's decision letter concluded, "Each of the parties is ordered to promptly execute any and all such documents as may be necessary to carry this decision into effect, and each of the parties is ordered to comply in all respects with the order of the Court." BC-44.

94. Worrall prepared the order and sent it to Respondent for approval as to form on October 1, 2012. BC-73, p. LWS 0177. On the same day, Worrall wrote to Judge Cranfill's administrative assistant, Dixie Hunter (copy to Respondent), and requested a setting for hearing on motions that had been filed early in the year:

> I [sic] writing to remind everyone that I do have some motions pending as does Mr. Stinson. As I recall, I have a motion pending for leave to amend our complaint to add a number of counts, Mr. Stinson has a motion pending to dismiss one of his claims; and I have an objection to that, all of which require resolution. Given the Court's ruling regarding the settlement in this matter, I believe that it only appropriate that these matters be placed on the calendar at Judge Cranfill's earliest convenience. I believe the earlier requests [for hearing] set forth the time required.

BC-73, p. LWS 0175.

95. On October 18, 2012, Worrall wrote to Judge Cranfill (copy to Respondent):

> I am enclosing herewith the Proposed Order in the above-referenced matter which does not bear Mr. Stinson's approval as to form. This order was transmitted to Mr. Stinson on October 1, 2012 and I have not heard from him since that time. Pursuant to Rule 58, I am transmitting this to you and a copy of my letter to Mr. Stinson inviting his objection and submission of his own form of order if any. I appreciate your consideration in the matter and look forward to hearing from anybody regarding objections, concerns, modifications or otherwise.

BC-73, p. LWS 0176.

96. On November 6, 2012—more than nine months after Respondent's January 26, 2012, letter advising the McClures that he would move to enforce the settlement agreement and assuring them, "I will prevail in any motion to enforce settlement and, in so doing, will be awarded attorney's fees"—Judge Cranfill entered the order denying Respondent's motion and ordered the parties to bear their own attorney fees and costs. BC-45.

97. On December 4, 2012, a hearing was held on the "Motion for Leave to Amend" Worrall had filed nearly ten months earlier, on February 7, 2012. Judge Cranfill granted Worrall

38

leave to amend the answer from the bench, but took the motion for leave to assert a counterclaim under advisement. On December 20, 2012, Judge Cranfill issued a decision letter denying leave to file a counterclaim and directed Respondent to prepare the order within 20 days as required by Rule 58. BC-73, p. LWS 0309.

98. On January 18, 2013, Worrall wrote to Judge Cranfill (copy to Respondent):

> Given the passage of time since the Court rendered its decision in the above referenced matter and in the interest of keeping this matter moving forward, I have taken it upon myself to prepare an Order in this matter. Mr. Stinson has apparently either forgotten to, or has not had time to prepare such an order, I am sending him a copy of this letter and my proposed order without his approval as to form. I guess the provisions of Rule 58 might be reversed insofar as he might have time to offer comment on same, however, I do believe that I have captured the essence of the Court's decision. If you find this appropriate, depending on how you want to interpret the rule, please execute same and send this office a certified copy at your earliest convenience. I would invite any thoughts, questions or comments by Mr. Stinson if he has time to respond.

BC-73, p. LWS 0201.

99. On February 11, 2013, Judge Cranfill entered the order submitted by Worrall. BC-73, p. LWS 0311. Worrall filed an amended answer three days later. BC-73, p. LWS 0312.

100. On February 14, 2013, Respondent signed a warranty deed conveying Lot 10 to H.R. Coe, d/b/a Coe Construction. BC-46.

101. On March 1, 2013, Worrall served requests for admission, interrogatories and requests for production of documents upon Respondent which required Respondent to divulge the evidence he possessed to support the allegations of the New Delhi Lawsuit. *See* BC-73, pp. LWS 0326-0344.

102. On March 29, 2013, Respondent wrote to Worrall regarding "discovery, the compelling of discovery, status and settlement." Referring to a "November 30, 2012" hearing

39

regarding "pending motions," Respondent stated that Judge Cranfill "ordered McClures to answer discovery," referring to the documents listed in Respondent's May 10, 2012, request for production of documents. Respondent demanded that the McClures produce the requested documents before Respondent answered Worrall's written discovery requests served March 1, 2013. On this subject, Respondent concluded, "This should be simple for you to do given the court's ruling and your failure to abide by it. But, if not, I will file a motion for protective order on Monday." BC-48.

103.    In the same March 29, 2013, letter, Respondent advised Worrall that Lot 10 had been sold. "Thus," Respondent wrote, "New Delhi is willing to settle the case for dismissal and a mutual release of any and all claims, causes, and complaints either party may have against the other; the release would include me as a named Releasor/Releasee." As he had with the mutual release he proposed in December 2011, Respondent conditioned his offer to withdraw the frivolous New Delhi Lawsuit upon a release of liability for himself individually. BC-48.

104.    On April 1, 2013, Respondent filed a motion for protective order with respect to Worrall's March 1, 2013, written discovery requests to Respondent, attaching as an exhibit Respondent's March 29, 2013, letter to Worrall, including the settlement proposal contained therein. Addressing the need for a protective order, Respondent urged, "Given the past conduct of Defendants—which conduct involves allegations of deceit and fraud and then the successful avoidance of a settlement agreement through the same tactics—Plaintiff is understandably concerned that the Defendants will obfuscate production or, more likely, tailor the production of the requested documents and responses to 'meet' only those documents produced by Plaintiff if discovery is allowed to proceed out of order." Respondent requested a protective order "that specifies that Plaintiff need not respond to Defendant's discovery until Defendants fully and

fairly answer the discovery first served by Plaintiff. That is the proper method to preserve the discovery process and ensure disclosure from the Defendants that is not limited to tailored to meet only the discovery that Defendants know the Plaintiff already has in its possession." BC-73, p. LWS 0318.

105. On April 11, 2013, Respondent wrote to Worrall and demanded, "Plaintiff will file a motion to compel discovery tomorrow unless I receive full and complete copies of discovery today." BC-49. Respondent was referring to the request for production of documents served upon Worrall on May 10, 2012. The documents described in Respondent's May 10, 2012, request for production are identical to those described in the subpoenas served on the McClures on May 17, 2012. As to those documents, Worrall filed a motion for protective order on May 25, 2012, which according to the Court file, BC-73, was never ruled upon by the Court.

106. On April 15, 2013, Respondent filed a motion to compel discovery with respect to Respondent's May 10, 2012, request for production of documents, attaching as exhibits his March 29, 2013, letter to Worrall, as well as his April 11, 2013, letter to Worrall. BC-73, p. LWS 0347.

107. On April 16, 2013, Worrall wrote to Respondent, challenging the representations contained in Respondent's March 29, 2013, letter as to what happened at the November 30, 2012, hearing. Worrall also took Respondent to task for the frivolous nature of the New Delhi Lawsuit:

> In sum Laurence, if you wish to continue to bludgeon my clients with this litigation, they are prepared to go forward. I proposed your settlement agreement to them and you will be aware, they are so upset by this bogus lawsuit against them that they simply refused and wished to have this matter heard by the Court so your conduct will, in their minds, be exposed to the Court. * * *

What I think is lost in all of this Laurence, is that, ordinary citizens do not look at the world the way lawyers do. To you, it apparently is no big deal to file a lawsuit for a party that my clients never had any kind of an agreement with, that is wholly owned by you and somehow claim that this was all well and good and then make outrageous allegations including fraud and deceit and other such matters against these people, all because they ask you to cut your weeds. They have spent on my services alone, more than they should have ever had to spend at all. Apparently, this is all because you wanted the money back from the purchase of this lot, since you had bought a car for your parents and were short of cash. The daily anxiety and stress of being involved in litigation has been visited by you upon the McClure's [sic]. They have to pay for their representation and you are doing this for yourself. To you it might appear to be sport, but to them it is deadly serious. This has had effects on their health as well as their pocket book. They are very concerned that it has affects [sic] on their business relationships as well. All of this because you wanted money to pay back the money that you borrowed to buy your parents a car. This is precisely why people have negative attitudes about attorneys Laurence, and I feel badly that this is the circumstance you have placed yourself in.

Worrall went on, "In any event Laurence, I have been hopeful that we would be able to conclude this matter without rancor or personal innuendo. Your blatant representations and your most recent correspondences [sic] to me have led me to a point where I no longer feel it is possible." Worrall advised Respondent, "[F]rom here on out, it is best that you and I communicate solely in writing. . . . It is regrettable that it has come to this state, but I think at this point, we have very little choice." BC-51.

108. On April 19, 2013, Worrall filed a response to Respondent's April 1, 2013, motion for protective order, in which he disputed the representations contained in Respondent's motion. BC-73, p. LWS 0358. In the response, Worrell complained about Respondent's continued depiction of the McClures as bad characters:

Counsel for the Plaintiff makes substantial scurrilous references to the conduct of the Defendants, alleging deceit and fraud and a successful avoidance of a settlement agreement through the same tactics. A full hearing was held and this Court

42

> determined that there was no settlement agreement based on *Wyoming Sawmills v. Morris* and Plaintiff's failure to prove that a settlement has been reached. If the Court will recall, the Defendants never testified in this matter as respects their settlement, but instead their counsel did and he specifically denied ever settling the case or having authority from his clients to settle the case. How this some [sic] or another involves deceit or fraud use of these tactics to avoid the settlement is beyond reason and frankly, is a statement made to this Court to defame the Defendants. Counsel for Plaintiff then goes on to state that he is concerned that these behaviors, which he has never proven, but only alleges, would cause the Defendants to obfuscate production or tailor their production of their requested documents and responses to meet only those documents produced by Plaintiff if discovery is allowed to proceed out of order.

BC-73, p. LWS 0360.

109. On the same day, Worrall filed a response to Respondent's April 15, 2013, motion to compel, challenging Respondent's May 10, 2012, written discovery requests as overly broad. BC-73, p. LWS 0364.

110. A hearing was held on Respondent's discovery motions on July 15, 2013. BC-73, p. LWS 0373. Judge Cranfill ordered the parties to meet and confer with respect to Respondent's request for production of documents by September 1, 2013, with the McClures to respond to agreed-upon discovery no later than September 1, 2013. Respondent was given until October 1, 2013, to respond to Worrall's written discovery requests.

111. On July 18, 2013, Respondent's assistant mailed a letter to Worrall with a proposed "Order Granting Plaintiff's Motion to Compel and Requiring Meet and Confer," asking Worrall to call Respondent if there are changes that Worrall believes should be made. LWS-35. Worrell responded with a letter the following day, July 19, 2013:

> I am in receipt of your proposed order and only have one significant issue with it. The issue is the caption because it sets forth things the Court did not do. There was no granting of your motion to compel. What occurred was the items set forth in 1, 2, 3 and 4 of your proposed order, however, the Court made no ruling

43

on the motion to compel and your motion for protective order. I have submitted a similar proposal to the Court without any offending language and would suggest that we simply utilize that form, because I will not approve this one as to form. If you wish to modify this to strike the caption and the language in the preamble that I find offensive, I would be happy to prove [sic] this as to form. I look forward to your reply.

LWS-26.

112. Rather than respond to Worrall's concerns, on August 2, 2013, Respondent submitted his proposed order to the Court with a pleading in which Respondent represented to the Court, "Plaintiff's counsel has sought the approval of the proposed *Order Granting Plaintiff's Motion To Compel And Requiring Meet And Confer* from Defendants' counsel, but Defendants' counsel has not responded in a timely matter [sic] . . . ." BC-73, p. LWS 0374. As demonstrated by Exhibit LWS-26 (*see* preceding paragraph), this was a misrepresentation by Respondent.

113. On August 7, 2013, Worrall filed "Defendant's Notice of Objection of Proposed Order" to which he attached both his proposed order and a copy of his July 19, 2013, letter to Respondent set forth above. BC-73, p. LWS 0378.

114. Although Respondent and Worrall both submitted proposed orders to Judge Cranfill following the July 15, 2013, hearing, no order was ever entered.

115. On August 12, 2013, pursuant to Judge Cranfill's direction to counsel to meet and confer, Worrall wrote to Respondent and stated in detail his concerns with the scope of Respondent's May 10, 2012, request for production of documents. The letter concluded:

> In sum, Laurence, the discovery is not very well drafted, with all due respect to your considerable talents, and as such, it's very difficult for me to find anything here that I should, quite frankly, tell my clients they have to do. If you want to narrow these things down to something more specific that can be focused upon, I would consider having my clients address that. To date, despite

request for this, as set forth in my reply to your motion to compel, nothing has taken place.

> When we left the courtroom the day the Judge ruled, I told you to look at my motion and give me a call or write me a letter regarding the contents of those as far as my concerns about discovery. Those same concerns are set forth in this letter so, frankly, I regard your failing to contact me, other than to request that I tell you what my problems were as being, once again, less than completely candid. It may very well be that we have to seek intervention from Judge Cranfill on this because as drafted, I can't in good conscience, tell my clients to go on this witch hunt. I'll look forward to your reply.

BC-53. Respondent did not reply.

116. On December 31, 2013, Worrall sent Respondent a lengthy email regarding the need to get the New Delhi Lawsuit resolved. BC-54, p. LWS 0157. In it, Worrall indicated that the McClures had incurred more than $7,000 in attorney fees defending the lawsuit and that they intended to submit a grievance regarding Respondent to the Wyoming State Bar. Respondent responded in an email dated January 2, 2014:

> What would be the nature of the bar grievance? I didn't represent McClures at the time of the land sale and even if I did the contract contains all the required disclosures. For me to understand your clients' position, I need to know what you or they think on this issue.
>
> Also, it seems to be misunderstood that the McClures engaged in fraud and use a bait and switch theme. I offered to dismiss the case because after the property sold, I was willing to take the loss. That doesn't change that the McClures engage in fraud or that other losses remain. I remain open to ideas on how to resolve the case, as we have discussed.

BC-54, pp. LWS 0156-157. Later that afternoon, Respondent sent Worrall an email that offered, for the first time, to narrow the scope of Respondent's May 10, 2012, request for production of documents. BC-55.

117. On January 3, 2014, Worrall responded to Respondent's query regarding the basis for a bar grievance, citing the lack of any evidence to support Respondent's allegations of fraud and deceit on the part of the McClures. BC-54, pp. LWS 0155-156.

118. Respondent replied on February 10, 2014, attaching his July 8, 2007, email to the McClures and stating, "At the end of the email there is a note that the McClures should not continue with excavation if the home could not be built for 400k, including lot costs. Following this email, the McClures did continue with excavation but later, after some excavation was done, advised me the home could not be built as was previously represented. Then they billed me for the excavation work. And I paid." BC-56.

119. The "excavation work" to which Respondent was referring is the work of A2Z Excavation work described in paragraph 29 above, and had nothing to do with construction of a house for Respondent.

120. On April 10, 2014, Respondent sent an email to Worrall with a draft of a settlement letter for Worrall's consideration:

> This letter follows our discussion regarding resolution of this case. I have previously offered to dismiss the case in exchange for a global release. The McClures declined. You have explained to me that the McClures feel wronged by the lawsuit and their payment of attorneys' fees. I have shared with you email communication between me and Robin McClure which followed my purchase of the real property and which supports the allegations in the lawsuit. This email happened years prior to the lawsuit.
>
> Now that the property has sold there is little sense for the parties to litigate the matter. While New Delhi has suffered a loss, the economics of litigating the case are not overly significant. It is clear that the lawsuit caused an embittered feeling and anger in the McClures and that was not the intent and is very unfortunate.
>
> After long consideration and discussion with you, New Delhi is willing to pay all McClure defendants $3500 to fully resolve all the claims in the lawsuit and in exchange for a global release,

46

including me as a releasee/releasor, of any and all past and future claims. You and I have discussed the scope of this release, but a settlement agreement would need to be circulated and agreed. This is certainly unusual, but you did an excellent job persuading me that this approach makes the best economic sense and may foster the best resolution. Please advise after you discuss with the McClures. Thank you.

BC-58.

121. On April 21, 2014, Judge Cranfill issued a notice to the parties warning of dismissal for lack of prosecution of the New Delhi Lawsuit. BC-60. Respondent did not respond. On May 7, 2014, the lawsuit was dismissed without prejudice by Judge Cranfill for lack of prosecution. BC-61.

122. On June 10, 2014, the McClures submitted a complaint to the Office of Bar Counsel regarding Respondent's conduct in filing and maintaining the New Delhi Lawsuit, which the McClures believe frivolous. The complaint included a request that "the State Bar Ethics Board review how Stinson uses his privileges for his personal vendettas." BC-62.

123. Upon review of the McClures' complaint, Bar Counsel initiated an investigation regarding possible violations of the Wyoming Rules of Professional Conduct by Respondent. On June 18, 2014, Bar Counsel wrote to Respondent and provided him with a copy of the McClure complaint, requesting a written response by July 2, 2014.

124. Respondent responded with a letter dated July 1, 2014, in which he asserted among other things:

- "The complaint against the McClures was founded upon a basis in law and fact and was not frivolous. The allegations in the proceeding had a factual basis. I had knowledge of the allegations, the initial investigation revealed that the conduct alleged in the complaint could be purposeful and might constitute a pattern and practice, and the budget provided by the McClures supports the factual allegations in the proceeding. The claims and causes of action have a basis in law."

47

- As a licensed general contractor and a licensed real estate agent, respectively, Mr. and Mrs. McClure "collectively owed a duty to be honest, forthright, and candid."

- "The parties executed a buy sell agreement [for the purchase of the lot]. The agreement to purchase the property was contained within, and became part of, a larger agreement for Defendants to build a residence on the property. This agreement to build was not reduced to writing but was express as well as implied through all of the negotiations to induce purchase of the land." It is noteworthy that this statement by Respondent is his first acknowledgment that he had signed a written purchase agreement for Lot 10 – the agreement that included the provision, "There are no verbal agreements between BUYER and SELLER or either party's agent to modify the terms and conditions of this contract. The representations made herein shall survive closing."

- "In reliance on McClures [sic] representations and that the real property and the home to be built upon the real property would inclusively cost $400,000.00 or less, the land was purchased for the $65,000.00, the asking and demand price set by the McClures. Additionally plans to build the home were previously purchased from the McClures and other costs and time were incurred in reliance on the agreement reached with the McClures and their company. The real property was purchased on April 26, 2007. Per agreement, this left $335,000.00 remaining for complete, full build of the home."

- "[O]nce the land was purchased based on the representations and agreement previously reached, the McClures then attempted to change and alter the previous agreement of a firm land and build price of $400,000 or less to a time and materials price with no set number."

- "Pre-filing investigation, including communications with a former employee, later revealed that the McClures had a history of engaging in this bait and switch tactic in other bidding circumstances, including charging a client twice the price agreed upon and low bidding other clients to later increase the bid after construction started."

- "After advising that they would not perform the contract as previously negotiated, the McClures did not take any action to make right the problem their misrepresentation caused. They did not offer to repurchase the land or otherwise compensate Plaintiff for the breach of contract."

- After the New Delhi Lawsuit was filed, the McClures hired LaBazzo to defend them. LaBazzo "suggested immediate settlement discussions indicating the McClures were ready to reach an agreement. An agreement was reached that no answer would be necessary so long as settlement discussions were ongoing. At that time, Mr. Steve Simonton was engaged to

48

represent the Plaintiff. Mr. LaBazzo and Mr. Simonton met on at least one occasion (perhaps more) and communicated to try to reach an agreement. Following their efforts, it was believed a settlement agreement had been reached which required the Plaintiff to deliver the property to the McClures and the McClures to tender payment (with Plaintiff taking a $15,000 loss). However, after the agreement was reduced to writing the McClures refused to sign. At the time the McClures refused to sign the agreement, Mr. LaBazzo fired the McClures and terminated his representation of them. It is not known if that is the direct result of the McClures failure to memorialize the settlement agreement. The McClures state that they terminated Mr. LaBazzo but this is not believed to be accurate." As demonstrated by the above-quoted correspondence between Respondent and LaBazzo, this latter assertion by Respondent is a fabrication. Respondent knew the McClures had terminated LaBazzo's services because LaBazzo told Respondent so.

BC-64.

125. On August 4, 2014, Bar Counsel wrote to Respondent, enclosing additional documents received from the McClures in support of their grievance. Bar Counsel requested that Respondent provide whatever evidence he had to substantiate the allegation of the New Delhi complaint that there was an agreement for a "firm land and build price of $400,000 or less."

126. On September 9, 2014, Bar Counsel received a response on behalf of Respondent from Cheyenne attorney, Stephen Kline. In response to Bar Counsel's query about evidence supporting the New Delhi Lawsuit, Kline reiterated the allegations of the complaint and repeated the representation earlier made by Respondent to Worrall that the McClures had begun excavation of the lot, attaching a copy of the A2Z Excavation invoice, Exhibit BC-8, to the response. BC-66. This statement, made again through counsel, is a misrepresentation by Respondent.

127. In the Formal Charge filed in this matter on December 30, 2014, Bar Counsel alleged that there is clear and convincing evidence of the following rules violations by Respondent in filing and maintaining the New Delhi Lawsuit:

49

a.    Respondent violated Rule 1.8(a) by failing to reduce the agreement for which he sued the McClures to a written agreement meeting the requirements of the rule.

b.    Respondent violated Rule 3.1(a) by filing and maintaining a frivolous lawsuit against the McClures.

c.    Respondent violated Rule 3.2 by failing to expedite the New Delhi Lawsuit after it was filed.

d.    Respondent violated Rule 3.3(a) by making numerous false statements of fact to the tribunal in his filings in the New Delhi Lawsuit.

e.    Respondent violated Rule 3.4 by knowingly disobeying an obligation under the rules of the tribunal, by making a frivolous discovery request and by failing to make a reasonably diligent effort to comply with legally proper discovery requests by the McClures.

f.    Respondent violated Rule 3.7 by filing a lawsuit on behalf of his client, New Delhi Trading Co., LLC, when Respondent was a necessary witness.

g.    Respondent violated Rule 4.1 by making false statements of material fact as set forth in the Formal Charge.

h.    Respondent violated Rule 4.4 by using means that had no substantial purpose other than to embarrass, delay, or burden the McClures in filing and maintaining the New Delhi Lawsuit.

i.    Respondent violated Rule 8.4(a) by violating the Rules of Professional Conduct as set forth in the Formal Charge.

j.    Respondent violated Rule 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation as set forth in the Formal Charge.

k.     Respondent violated Rule 8.4(d) by engaging in conduct prejudicial to the administration of justice as set forth in the Formal Charge.

128.   In his Answer to the Formal Charge, Respondent asserted the following affirmative defense:

> Based on certain arguments raised by bar counsel Mark Gifford, Mr. Stinson offered to stipulate to reasonable discipline, including suspension, and bar counsel refused, preferring to try the case.

Amended Formal Charge, ¶ 67.

129.   Bar Counsel sought and obtained leave to file an Amended Formal Charge alleging that the foregoing affirmative defense is without basis in fact, and therefore constitutes a violation of Rule 3.1(a); that it represents a lack of candor to the tribunal in violation of Rule 3.3; and is also a misrepresentation in violation of Rule 8.4(c).

130.   In the Amended Formal Charge, Bar Counsel further alleged that the foregoing affirmative defense constitutes an improper attempt by Respondent to prejudice these proceedings by injecting improper evidence of settlement negotiations into the proceedings, and that Respondent's attempt to inject an improper and prejudicial issue into this proceeding constitutes a violation Rule 3.4(c) because it is a knowing violation of the rules of this tribunal.

131.   In the course of defending the New Delhi Lawsuit, the McClures incurred $2,007.28 in legal fees and costs with Mr. LaBazzo and $9,152.13 in legal fees and costs with Mr. Worrall. BC-69; BC-70; BC-71. In addition, McClures engaged Sheridan attorney Anthony Wendtland to represent them with respect to their depositions taken by Respondent in this disciplinary proceeding, incurring legal fees and costs in the amount of $7,743.59. BC-74; BC-75.

132. The Board of Professional Responsibility finds that Bar Counsel has carried his burden of proving by clear and convincing evidence that Respondent violated the following Rules of Professional Conduct in bringing and maintaining the New Delhi lawsuit:

a. Respondent violated Rule 3.3(a) by making numerous false statements of material fact to the Court in the New Delhi Lawsuit as set forth above, and further by offering evidence to the Board that Respondent knew to be false, i.e., Respondent's testimony regarding the mutual release he drafted in December 2011 (*see* ¶¶ 59-60 above).

b. Respondent violated Rule 3.4(c) by knowingly disobeying an obligation under the rules of the tribunal as set forth above. Respondent failed to prepare and approve orders at the Court's direction.

c. Respondent violated Rule 3.4(d) by making a frivolous discovery request to the McClures and by failing to make a reasonable diligent effort to comply with a legally proper discovery request by the McClures as set forth above.

d. Respondent violated Rule 4.4(a) by using means that had no substantial purpose other than to embarrass, delay, or burden the McClures in filing and maintaining the New Delhi Lawsuit. The Board notes that the New Delhi Lawsuit began with a demand from Respondent to be paid $71,000.00 with threats of punitive damages and allegations of actual fraud, and ended with Respondent attempting unsuccessfully to pay the McClures $3,500.00 in exchange for a release that would absolve himself of individual liability for his actions. This unlikely course demonstrates the true gravamen of Respondent's misconduct. The New Delhi Lawsuit was retaliation against the

McClures for their repeated complaints to the City of Cody concerning Respondent's failure or refusal to maintain Lot 10 and should never have been filed.

e. Respondent violated Rule 8.4(a) by violating the Rules of Professional Conduct as set forth above.

f. Respondent violated Rule 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation to the Court, the McClures and the various attorneys hired by the McClures to represent them in the New Delhi matter, as set forth above.

g. Respondent violated Rule 8.4(d) by engaging in conduct prejudicial to the administration of justice as set forth above.

133. The Board finds that Bar Counsel has not carried his burden of proving by clear and convincing evidence that Respondent violated Rules 1.8(a); 3.1(a); 3.2; 3.7 and 4.1.

a. With respect to the allegations concerning a violation of Rule 1.8(a), the Board finds that the February 20, 2007 meeting between the McClures and Respondent was an isolated event. Thus, at the time of the McClures' discussions with Respondent concerning Lot 10, there was no ongoing attorney-client relationship. The Board is also aware that subsection 28 of the Disciplinary Code for the Wyoming State Bar contains a four year statute of limitations for bringing complaints against respondents.

b. With respect to the allegations concerning a violation of Rule 3.1(a), when filing a lawsuit against the McClures, Respondent is permitted to assert allegations when there is a basis in law and fact for doing so, so long as the case is not frivolous. As the case moves forward and the parties are able to further assess the applicable facts and law, the parties can then determine whether the allegations in the complaint are

53

appropriate. Respondent testified he purchased Lot 10 solely because he believed that the McClures could and would construct the house on Lot 10 within the budget established in the software print-out provided to Respondent by the McClures in LWS-1. The majority of the Board could not determine that the Complaint was frivolous and notes that no motion to dismiss any of the claims was filed in the underlying action.

c.       With respect to the allegations concerning a violation of Rule 3.2, while the Rule requires that an attorney timely move a case forward, it also provides that the pace must be consistent with the interests of the client. The Board notes that the pace of a lawsuit can vary for a variety of reasons and is not necessarily within one lawyer's control.  The court's docket, the priorities of the attorneys and their clients, and other factors can impact an attorney's ability to move a case forward. While Respondent was not generally timely with respect to his actions related to the New Delhi lawsuit, the pace of the lawsuit was beneficial to New Delhi (Respondent's client). The McClures were understandably emotional about the lawsuit and did not want to settle with New Delhi. The Board notes that the passage of time often allows the parties to gain perspective after the emotions have cooled, which brings the case to a point where resolution is even possible. Moreover, Worall's actions, on behalf of the McClures, also contributed to the slow pace of resolution of the case.

d.       With respect to the allegations concerning a violation of Rule 3.7, this rule does not prevent Respondent from filing a lawsuit in which Respondent may be a necessary witness. Rather, it prevents Respondent from acting as an advocate **at a trial** in which Respondent knows he is likely to be a necessary witness. The New Delhi

54

proceedings were dismissed by the Court before a trial commenced. In those instances in which a hearing was held before the Court, Respondent did not testify.

e.      With respect to the allegations concerning a violation of Rule 4.1, it was not evident to the Board who Bar Counsel was alleging to be the third person to whom Respondent, on behalf of New Delhi, knowingly made false statements of material fact or law.

f.      The Board was troubled by this case. The Board believes that neither Respondent, nor the McClures, were credible in much of their testimony during the disciplinary or sanctions phases of the case. Both Respondent and the McClures lacked candor which raised the Board's suspicion about the motivations of both parties throughout the proceedings.

**DETERMINING THE APPROPRIATE SANCTION FOR RESPONDENT'S MISCONDUCT**

134.    In determining an appropriate sanction, the Board is guided by the American Bar Association's "Standards for Imposing Lawyer Discipline" (hereafter referred to as the "ABA Standards") which state, "The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession."

135.    ABA Standard 3.0 lists four factors to be considered in imposing a sanction after a finding of lawyer misconduct:

(a) the duty violated;
(b) the lawyer's mental state;
(c) the potential or actual injury caused by the lawyer's misconduct; and
(d) the existence of aggravating or mitigating factors.

136.   Much of Respondent's misconduct falls within the heading "Violation of Duties Owed to the Legal System," which the ABA Standards subcategorize (pertinent to the Board's findings in this case) as "False Statements, Fraud, and Misrepresentation" (Standard 6.1) and "Abuse of the Legal Process" (Standard 6.2). These two standards apply to situations in which lawyers are found to have violated Rules 3.3(a), 3.4(c) and (d), 4.4(a) and 8.4(d). Taking these standards in reverse order, Standard 6.2 provides:

> Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving failure to expedite litigation or bring a meritorious claim, or failure to obey any obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists:

> 6.21   Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, or causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding.

> 6.22   Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding.

> 6.23   Reprimand [i.e., "public censure" under Section 4(a)(iii) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer negligently fails to comply with a court order or rule, and cause injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding.

> 6.24   Admonition [i.e., "private reprimand" under Section 4(b) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer engages in an isolated instance of negligence in complying with a court order or rule, and causes little or no actual or potential injury to a party, or causes little or no actual or potential interference with a legal proceeding.

137.   Standard 6.1, "False Statements, Fraud, and Misrepresentation," provides:

> Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in

cases that are prejudicial to the administration of justice or that involves dishonesty, deceit, or misrepresentation to a court:

6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

6.13 Reprimand [i.e., "public censure" under Section 4(a)(iii) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false or in taking remedial action when material information is being withheld, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

6.14 Admonition [i.e., "private reprimand" under Section 4(b) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer in an isolated instance of neglect in determining whether submitted statements or documents are false or in failing to disclose material information upon learning of its falsity, and causes little or no actual or potential injury to a party, or cause little or no adverse potentially adverse effect on the legal proceeding.

138. Also implicated by Respondent's conduct in violating Rule 8.4(c) is Standard 5.1 "Failure to Maintain Personal Integrity," which falls under the broad heading, "Violations of Duties Owed to the Public" and provides:

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation:

5.11 Disbarment is generally appropriate when:

(a) a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of

57

justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

5.12    Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.

5.13    Reprimand [i.e., "public censure" under Section 4(a)(iii) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

5.14    Admonition [i.e., "private reprimand" under Section 4(b) of Wyoming's Disciplinary Code] is generally appropriate when a lawyer engages in any other conduct that reflects adversely on the lawyer's fitness to practice law.

### THE SECOND FACTOR: THE LAWYER'S MENTAL STATE

139.    The preamble to the ABA Standards includes the following discussion regarding mental state:

> The mental states used in this model are defined as follows. The most culpable mental state is that of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result. The next most culpable mental state is that of knowledge, when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result. The least culpable mental state is negligence, when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation of a care that a reasonable lawyer would exercise in the situation.

140.    The Board finds that in bringing and maintaining the New Delhi Lawsuit, Respondent acted with the conscious objective and purpose of causing injury to the McClures,

and that Respondent further engaged in a pattern of intentional misrepresentations as more fully set forth above.

### The Third Factor: The Potential Or Actual Injury Caused By The Lawyer's Misconduct

141. Under the ABA Standards, "injury" is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little or no' injury; a reference to 'injury' alone indicates any level of injury greater than 'little or no' injury." "Potential injury" is defined as "harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct."

142. The Board finds that Respondent's conduct in filing and maintaining the New Delhi Lawsuit caused injury to the McClures by subjecting them to significant legal fees and costs. However, while the New Delhi Lawsuit no doubt took a toll on the McClures, the Board did not believe much of the McClures' testimony in which they painted themselves as victims emotionally devastated by the antics of Respondent. The McClures were not vulnerable victims, as they allege. The Board believes the McClures are relatively experienced and sophisticated business people with their own motivations and agendas.

### The Fourth Factor: The Existence Of Aggravating Or Mitigating Factors

143. ABA Standard 9.0, entitled "Aggravation and Mitigation," provides as follows:

9.1 *Generally*
After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose.
9.2 *Aggravation*
    9.21 *Definition.* Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed.

59

9.22 *Factors which may be considered in aggravation.* Aggravating factors include:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of the victim;

(i) substantial experience in the practice of law;

(j) indifference in making restitution; and

(k) illegal conduct, including that involving the use of controlled substances.

## 9.3 *Mitigation*

9.31 *Definition.* Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.

9.32 *Factors which may be considered in mitigation.* Mitigating factors include:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

(e) full and free disclosure of disciplinary board or cooperative attitude toward proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical disability;

(i) mental disability or chemical dependency including alcoholism or drug abuse when:

    (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

    (2) the chemical dependency or mental disability caused the misconduct;

    (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

    (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(j) delay in disciplinary proceedings;

(k) imposition of other penalties or sanctions;

(l) remorse; and

(m) remoteness of prior offenses.

9.4    *Factors Which Are Neither Aggravating nor Mitigating*

The following factors should not be considered as either aggravating nor mitigating:

(a)  forced or compelled restitution;

(b)  agreeing to the client's demand for certain improper behavior or result;

(c)  withdrawal of complaint against the lawyer;

(d)  resignation prior to completion of disciplinary proceedings;

(e)  complainant's recommendation as to sanction; and

(f)  failure of injured client to complain.

144.    The Board finds no mitigating factors.

145.    The Board finds the following aggravating factors: (1) dishonest or selfish motive; (2) pattern of misconduct; (3) multiple offenses; (4) refusal to acknowledge wrongful nature of conduct; (5) submission of false statements during the disciplinary process; and (6) substantial experience in the practice of law.

146.    The Board notes that Respondent is the recipient of prior discipline, *see Bd. of Prof. Resp. v. Stinson*, 337 P.3d 401 (Wyo. 2014). However, as the public censure issued by the Court in that case came after Respondent's misconduct in the present matter, the Board does not consider Respondent's prior discipline to be an aggravating factor.

RECOMMENDED SANCTION

147.    The Board recommends that the following sanctions be imposed for Respondent's misconduct:

a.    Respondent should be suspended for a period of nine (9) months pursuant to Section 4(a) of the Disciplinary Code for the Wyoming State Bar.

b.    Pursuant to Section 4(c), Respondent should be ordered to pay restitution to the McClures in the amount of $11,641.17, said sum representing the attorneys' fees and costs incurred by the McClures in defending the New Delhi Lawsuit. *See* BC-71.

Said payment should be made to the Wyoming State Bar for transmission to the McClures.

       c.      Pursuant to Section 26, Respondent should be ordered to pay costs of this disciplinary proceeding in the amount of $25,247.99 and an administrative fee of $500.00 to the Wyoming State Bar.

DATED this _8th_ day of December, 2015.

                              Jenifer E. Scoggin, Chair
                              Board of Professional Responsibility