[¶3] In her response, Ms. Mears stated that Dr. Cushner "was never a client," although "there was a brief period of time in which we were friends." She acknowledged that she had reviewed and commented on a contract he was negotiating, but asserted that this was only "a favor to a friend." Ms. Mears did not deny that she had received money from Dr. Cushner, but explained that
his large dog ... severely injured my much smaller dog necessitating more than $7,000 in veterinarian bills before she finally passed as a result of the injuries caused by his dog. Additionally, [Dr.] Cushner's dog also ruined woodwork, doors, home furnishings, carpets and décor at my two separate homes.
[¶4] Bar Counsel continued to pursue the investigation, collecting additional responses, information, and documents from both Ms. Mears and Dr. Cushner. Ms. Mears clarified that she and Dr. Cushner "were involved in a personal relationship that began in the summer of 2014 and ended in December 2014." She also referred to their relationship as "romantic." Both Ms. Mears and Dr. Cushner provided copies of e-mail messages they had exchanged concerning their relationship and the breakup of that relationship.
[¶5] Although Ms. Mears insisted that neither she nor Dr. Cushner had intended to create an attorney-client relationship, she later recognized that "an attorney-client relationship was created" when she reviewed the contract as a favor to him. However, that attorney-client relationship was limited and brief, terminating before the end of October of 2014. Dr. Cushner paid the money to Ms. Mears in November and December of 2014. Because the money was paid after the attorney-client relationship had ended, Bar Counsel determined that Ms. Mears had not engaged in an improper transaction with a client, and declined to charge her with violating Rule 1.8(a) of the Wyoming Rules of Professional Conduct.
[¶6] However, based on information Ms. Mears had provided during the investigation, Bar Counsel filed a formal complaint charging her with violations of Rule 8.1, which prohibits a lawyer from knowingly making a false statement of material fact in connection with a disciplinary matter, and with violations of Rule 8.4(c), which prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. Specifically, Bar Counsel charged Ms. Mears with:
(a) Falsifying the copies of the breakup emails [she] produced to Bar Counsel.
(b) Misrepresenting that she incurred more than $7,000 in vet[erinarian] bills for injuries inflicted upon [her] dog by [Dr.] Cushner's dog.
*832 (c) Misrepresenting the extent and cost of repairs to [her] Jackson residence.
(d) Misrepresenting what [she] did with the money she received from [Dr.] Cushner.
[¶7] Following a hearing on June 27 and 28, 2017, the BPR found that Bar Counsel had presented clear and convincing evidence that Ms. Mears committed several violations of Rules 8.1 and 8.4(c). As a sanction, it recommended a nine-month suspension. It further recommended that Ms. Mears be required to pay a $750.00 administrative fee as provided in Rule 25(b) of the Wyoming Rules of Disciplinary Procedure, and to pay $8,149.06 to reimburse the Wyoming State Bar for the costs of the proceeding as provided in Rule 25(e) of the Wyoming Rules of Disciplinary Procedure. The BPR transmitted its Report and Recommendation to this Court. Ms. Mears filed timely objections, and the Wyoming State Bar filed a response to her objections.
II. DISCUSSION
A. Disciplinary Procedure
[¶8] "The Court conducts a de novo review of all aspects of attorney discipline." Board of Prof'l Responsibility v. Custis , 2015 WY 59, ¶ 36, 348 P.3d 823, 832 (Wyo. 2015).
The Court will give due consideration to the findings and recommendations of the BPR, but the ultimate judgment in [disciplinary] proceedings ... is vested in the Court. Accordingly, the Court will examine the evidence, make findings, determine whether there has been an infraction of the Wyoming Rules of Professional Conduct, and impose the discipline which the Court considers appropriate.
Rule 16(b), Wyoming Rules of Disciplinary Procedure. To impose discipline, we must be satisfied that there is "substantial, clear, convincing, and satisfactory evidence" supporting the findings of the BPR. Board of Prof'l Responsibility v. Richard , 2014 WY 98, ¶ 53, 335 P.3d 1036, 1052 (Wyo. 2014) (quoting Mendicino v. Whitchurch , 565 P.2d 460, 475 (Wyo. 1977) ). Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable. Custis , ¶ 42, 348 P.3d at 833.
B. Rule 8.1: False Statements
[¶9] Rule 8.1 of the Wyoming Rules of Professional Conduct provides that "a lawyer ... in connection with a disciplinary matter, shall not: (a) knowingly make a false statement of material fact." Comment 1 to this Rule specifies that the "duty imposed by this Rule applies to a lawyer's own ... discipline as well as that of others." We find that Ms. Mears committed several violations of Rule 8.1.
1. E-mail Messages
[¶10] During the investigation, both Ms. Mears and Dr. Cushner provided Bar Counsel with their copies of an e-mail message he sent to her on December 29, 2014. The version provided by Dr. Cushner commented on some difficulties in their relationship, and included this language: "I do know that you shouldn't [have] had me help you financially when you knew this was coming. [T]hat is wrong. Please make arrangements to pay me back." The version provided by Ms. Mears included the same comments on difficulties in their relationship, but omitted the quoted language.
[¶11] Ms. Mears and Dr. Cushner also provided Bar Counsel with different versions of an e-mail message she had sent to him earlier in the day on December 29, 2014. Ms. Mears's version discussed aspects of her relationship with Dr. Cushner, and informed him that she
want[ed] to continue seeing you and getting to know you. But this needs to happen without the stressors or pressures, real and perceived, we have already been confronted with. We need to know each other well enough to know that facing the challenges and stressors is worth it together. We have not had the time or opportunity to know this about each other.
Dr. Cushner's version included the quoted language, but the two versions of these e-mail messages end differently. The version presented by Dr. Cushner concluded: "I think some time to reflect and consider these thoughts is warranted. And time to decide if *833 and how we go forward from here." The version presented by Ms. Mears did not include the language, "And time to decide if and how we go forward from here." Instead, it concluded: "I think some time to reflect and consider these thoughts is warranted. I cannot continue in any form of friendship with you and I truly hope you can respect that."
[¶12] In her testimony at the hearing, Ms. Mears denied altering the e-mail messages. However, the BPR found Ms. Mears's testimony "untenable in that it is at odds with, and contradicted by, other evidence." We agree. In a letter written to Bar Counsel during the investigation, Ms. Mears's counsel admitted that Ms. Mears had deleted some language from the copy she provided of her e-mail message to Dr. Cushner. She stated that Ms. Mears had created several versions of the e-mail message, including one she had sent to her therapist. She explained that "Ms. Mears believes she printed some variation of this e-mail and stored it in her hard file ... and that is the version that was provided to you." But despite this attempt to provide an innocent explanation for altering the e-mail message, Ms. Mears's counsel acknowledged that the version sent to Ms. Mears's therapist "is the same as the email provided to your office by Dr. Cushner."
[¶13] We also note that Ms. Mears's version of the second e-mail message is internally inconsistent. The concluding statement that she could not "continue in any form of friendship" with Dr. Cushner is at odds with the earlier statement in the same e-mail message that she wanted "to continue seeing" him and "getting to know" him. The inconsistency indicates that Ms. Mears altered her version of the e-mail message before providing it to Bar Counsel.
[¶14] It is particularly troubling that Ms. Mears deleted the sentence "Please make arrangements to pay me back" from the first e-mail message discussed above. At the time Ms. Mears provided this e-mail message to Bar Counsel, he was investigating the charge that she had improperly entered into a transaction with a client. Dr. Cushner maintained that the transaction was a loan, while Ms. Mears contended that it was reimbursement for damage done by Dr. Cushner's dog. The language deleted by Ms. Mears is consistent with Dr. Cushner's claim that he had loaned her money. As the BPR found, this alteration indicates that Ms. Mears "intentionally tampered with and withheld evidence that would appear to support [Dr. Cushner's] claim that the payments he made to [her] were loans and not reimbursements." We find clear and convincing evidence in this record that Ms. Mears knowingly falsified copies of e-mail messages produced to Bar Counsel.
2. Veterinary Bills
[¶15] As set forth in ¶ 3 above, Ms. Mears claimed that Dr. Cushner's large dog severely injured her small dog and that she incurred more than $7,000.00 in veterinary bills as a result of the injury. She further claimed that her dog eventually passed away as a result of the injuries caused by his dog. She claimed that Dr. Cushner gave her money as reimbursement for the damage caused by his dog. At the hearing, she testified about these claims, and the BPR received into evidence copies of several veterinary bills that purported to support Ms. Mears's claims.
[¶16] Having reviewed this evidence, we agree with the BPR that Ms. Mears's claims "that she incurred more than $7,000.00 in veterinary bills for her small dog, and that the dog eventually succumbed to injuries inflicted by [Dr. Cushner's] larger dog, are demonstrably untrue." All of the veterinary bills produced by Ms. Mears bore dates in 2015, after she had broken off the relationship with Dr. Cushner near the end of 2014. The veterinary records do not reflect any injury inflicted by a larger dog during the period she and Dr. Cushner were in a relationship.
[¶17] Ms. Mears indicated that the stress of being around Dr. Cushner's larger dog was causing her smaller dog to have seizures, but the veterinary records indicate that her dog began having seizures in May of 2014, several months before she met Dr. Cushner. She also said that her dog died from injuries inflicted by Dr. Cushner's dog. However, the veterinary records provided by Ms. Mears show that her dog did not die until May of 2015, several months after her relationship *834 with Dr. Cushner ended. In addition, the veterinary bills provided by Ms. Mears total just over $2,200.00, far less than the $7,000.00 she claimed. Ms. Mears asserted that there was another veterinarian who treated her dog and lost the records, but she provided no evidence from any other veterinarian that any records had been lost. Based on this evidence, we find clear and convincing proof that Ms. Mears knowingly made false statements of fact material to support her claim that Dr. Cushner's dog injured and eventually killed her dog.
3. Damage to Ms. Mears's Homes
[¶18] Ms. Mears also claimed that Dr. Cushner's dog "ruined woodwork, doors, home furnishings, carpets and décor at my two separate homes" in Jackson and Casper. She produced a bill for work to "Repair/replace damage caused by large dog" for repairs totaling just over $6,000.00. Having reviewed the record, we agree with the BPR that this claim is "demonstrably untrue."
[¶19] The invoice was dated October 11, 2014, but indicated that the work was done on October 21, 2015. We find it unlikely that the owner of the construction company prepared an invoice more than a year in advance of doing the work. It is possible that one of the dates contains a typographical error. However, neither date-October 11, 2014 or October 21, 2015-is otherwise supported by the record. Notably, the construction company owner testified that the work was done in the late summer of 2013, right after his bankruptcy, or perhaps later in 2013 or early 2014. Ms. Mears did not begin a relationship with Dr. Cushner until the summer of 2014. Accordingly, the damage repairs reflected in this invoice could not have been caused by Dr. Cushner's dog.
[¶20] Many other details of the evidence about repairs to Ms. Mears's home are implausible. The owner of the construction company testified that Ms. Mears paid the bill in total on December 29, 2014, a date also reflected on the invoice. The e-mail messages between Ms. Mears and Dr. Cushner, the ones discussed above, are also dated December 29, 2014, yet in more than two printed pages of discussion about their relationship, there is no mention of the repairs or any payment for them. The owner testified that he charged Ms. Mears only for labor, because he replaced doors, flooring, and carpet using leftover materials on hand at Ms. Mears's residence. The invoice reflects a charge of $870 to replace two laminate floor boards, each only two or three feet in length. He also testified that he charged $450 to cut out one square foot of linoleum and patch it with a replacement piece. The BPR found these amounts "so unreasonable as to be absurd." The owner claimed that he stayed at Ms. Mears's Jackson home while doing the repairs, but neither Dr. Cushner nor another witness who claimed to have visited Ms. Mears's home in December of 2014 was aware of his presence during that time, or noticed any repairs that were being done or had been done. The owner averred that Ms. Mears paid him in cash. Ms. Mears's bank records indicate that the money from Dr. Cushner was deposited into her bank accounts, but do not show that she made cash withdrawals corresponding to her payments for the repairs.
[¶21] Finally, we find it significant that Ms. Mears represented the owner of the construction company in his divorce. The date of the invoice, October 11, 2014, is one day after Ms. Mears had filed a divorce complaint on his behalf. As the BPR observed, Ms. Mears's representation of the owner in his divorce provided an opportunity for her to enlist his aid in fabricating evidence. Taking this evidence in total, we find clear and convincing proof that Ms. Mears misrepresented the damages done by Dr. Cushner's dog and the extent and cost of resulting repairs.
4. What Ms. Mears Did with the Money
[¶22] The fourth charge Bar Counsel brought against Ms. Mears was that she misrepresented what she did with the money she received from Dr. Cushner. We believe that the best way to discuss this charge is to quote the BPR's finding:
Finally, the evidence shows that [Ms. Mears] misrepresented what she did with the $11,487.00 she received from [Dr. Cushner.] Though she continued to insist at the hearing that the bulk of the money *835 was used to pay for veterinary bills and repair costs, the bank statements belie [her] claims. [Ms. Mears] simply spent the money she received from [Dr. Cushner] on ordinary living and business expenses as reflected in the bank statements.
Our review of the record reveals clear and convincing evidence supporting this finding.
[¶23] Her claims to have spent $7,000.00 on veterinary bills and $6,000.00 on repairs to her homes, as discussed above, were demonstrably inaccurate. As also discussed earlier, the owner of the construction company who claimed to have done repairs on Ms. Mears's Jackson home testified that she paid him in cash. However, while her bank records indicate that the money from Dr. Cushner was deposited into her bank accounts, there is no indication that she made cash withdrawals corresponding to her payments for the repairs. In general, Ms. Mears's bank records are inconsistent with her claims about what she did with the money received from Dr. Cushner.
[¶24] In addition, as Bar Counsel's investigation proceeded, Ms. Mears began placing less emphasis on the claims that Dr. Cushner paid her as reimbursement for veterinary bills and damages caused by his dog, and more emphasis on a claim that much of the money he gave her was reimbursement for purchases she had made for him. These purchases, she asserted, included "the purchase of a gun," "the purchase of artisan belt buckles," "more than one purchase ... of a large dog bed for his dog, treats and dog food," "a pair of winter boots," and "other purchases from stores in Jackson and Casper for items he was not able to find or obtain in Pinedale or Jackson." She provided no receipts for these purchases, but contended that she could not do so because she had given them all to Dr. Cushner. Ms. Mears did not provide any credit card statements or other evidence to support her claim.
C. Rule 8.4: Dishonesty, Fraud, Deceit or Misrepresentation
[¶25] Rule 8.4 of the Wyoming Rules of Professional Conduct provides: "It is professional misconduct for a lawyer to: ... (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation." The evidence, discussed above, proves that Ms. Mears falsified e-mail messages, falsely claimed that Dr. Cushner's dog injured and eventually killed her dog, misrepresented the damages done by Dr. Cushner's dog and the extent and cost of resulting repairs, and misrepresented what she did with the money received from Dr. Cushner. This evidence constitutes clear and convincing proof that Ms. Mears engaged in conduct involving dishonesty and misrepresentation in violation of Rule 8.4(c).
D. Ms. Mears's Objections
[¶26] While Ms. Mears states that she disagrees that she misrepresented the amount of veterinary bills or the cost of home repairs, the thrust of her objections to the BPR's Report and Recommendation does not involve factual findings. Instead, she focuses on two legal arguments. We consider each in turn, and reject both.
[¶27] In her first objection, Ms. Mears asserts that "to constitute an offense warranting discipline, a lawyer must have embraced a scienter element, requiring not only an awareness of the falsity of the representation, but also an intent to deceive." She claims that, even if she made misrepresentations as alleged, those misrepresentations were not made with an intent to deceive. She concludes that there is a lack of evidence of the "scienter necessary to establish an intentional and knowing misrepresentation for disciplinary purposes."
[¶28] Assuming, without deciding, that Ms. Mears is correct about the scienter element, we find clear and convincing evidence in the record that she submitted false information to Bar Counsel with the intent to deceive. In the initial investigation of a violation of Rule 1.8(a), there were two main questions: whether Ms. Mears and Dr. Cushner had an attorney-client relationship, and what was the nature of the transaction between them. On the second question, Dr. Cushner claimed it was a loan, while Ms. Mears claimed it was reimbursement. Documents she provided in support of her claim included an invoice purporting to show repair work on her residence in Jackson. That invoice was false, and as the *836 BPR found, Ms. Mears "orchestrated the production of the false invoice for the sole (and fraudulent) purpose of supporting [her] groundless claim that [Dr. Cushner's] dog did thousands of dollars of damage to [her] Jackson and Casper residences." We find this to be clear and convincing evidence of her intent to deceive Bar Counsel, and later, the BPR.
[¶29] In her second objection, Ms. Mears points out that Rule 8.1 prohibits knowingly making "a false statement of material fact." She contends that, even if she made false statements, they were not material. She points out that the initial investigation was about an improper transaction between an attorney and her client. Ms. Mears claims it was "obvious early in the investigation, there was no basis for that assertion" because evidence showed that the transaction took place after Ms. Mears and Dr. Cushner terminated their attorney-client relationship. According to Ms. Mears, if there was no attorney-client relationship, then information about the nature of their transaction was not material.
[¶30] A "material fact" is a "fact that is significant or essential to the issue or matter at hand; esp., a fact that makes a difference in the result to be reached in a given case." Black's Law Dictionary 710 (10th ed. 2014). In the investigation of an improper transaction between an attorney and her client, there are two facts that make a difference: whether there was an attorney-client relationship, and the nature of the transaction. Because the nature of the transaction "makes a difference in the result," it is a material fact. Ms. Mears presented false information about that material fact.
[¶31] We understand Ms. Mears's argument to be that if one material fact-the attorney-client relationship-is disproven, then the other material fact-the nature of the transaction-becomes immaterial. However, Ms. Mears made false representations about the nature of the transaction in her very first response to Bar Counsel's request for information:
Regarding any monies paid to me by [Dr.] Cushner: his large dog ... severely injured my much smaller dog necessitating more than $7,000 in veterinarian bills before she finally passed as a result of the injuries caused by his dog. Additionally, [his] dog also ruined woodwork, doors, home furnishings, carpets and décor at my two separate homes. These issues had absolutely nothing to do with any attorney-client relationship as there never was one.
At the time these false statements were made, it had not yet been determined that Ms. Mears and Dr. Cushner had terminated their attorney-client relationship before the transaction occurred. Accordingly, even under Ms. Mears's theory that the materiality of a fact may change during the course of an investigation, her false statements about the nature of the transaction were material when they were made.
E. Determination of an Appropriate Sanction
[¶32] The BPR recommends that Ms. Mears be suspended from the practice of law for a period of nine months. In making this recommendation, the BPR relied on Rule 15(b)(3)(D) of the Wyoming Rules of Disciplinary Procedure, which provides:
In imposing a sanction after a finding of misconduct by the respondent, the BPR shall consider the following factors, as enumerated in the ABA Standards for Imposing Lawyer Sanctions:
(i) Whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;
(ii) Whether the lawyer acted intentionally, knowingly, or negligently;
(iii) The amount of the actual or potential injury caused by the lawyer's misconduct; and
(iv) The existence of any aggravating or mitigating factors.
The BPR found that Ms. Mears violated duties owed to the legal system and to the profession, that she acted intentionally, and that she inflicted serious injury upon the disciplinary system.
[¶33] We agree that there is clear and convincing evidence in the record to support these findings. As another court observed, "Attorneys admitted to the practice of law in this State have an affirmative obligation to *837 cooperate with disciplinary authorities when a disciplinary complaint is lodged against them." In re Mosca , 686 A.2d 927, 930 (R.I. 1996) (per curiam). Ms. Mears's misrepresentations violated this obligation to the legal system and to the profession. There is ample evidence that she intentionally made false statements to Bar Counsel, and repeated many of those misrepresentations in the hearing before the BPR. Both Bar Counsel and the BPR devoted extensive resources toward resolving the matter, providing clear and convincing evidence of the injury caused by Ms. Mears's conduct.
[¶34] The BPR also found that Ms. Mears's violations of Rule 8.1 and 8.4(c) fell within two relevant ABA Standards, 5.1 and 6.1. Standard 5.1 is entitled "Failure to Maintain Personal Integrity," and it provides:
Absent aggravating or mitigating circumstances, ... the following sanctions are generally appropriate in cases involving a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation:
5.11 Disbarment is generally appropriate when:
(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or
(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.
5.12 Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.
5.13 Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.
5.14 Admonition is generally appropriate when a lawyer engages in any other conduct that reflects adversely on the lawyer's fitness to practice law.
[¶35] The BPR found that Ms. Mears's repeated misrepresentations of material fact constituted intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously reflected on her fitness to practice law. Accordingly, under Standard 5.11(b), the BPR noted that disbarment would be the appropriate sanction. This finding is fully consistent with the clear and convincing evidence concerning Ms. Mears's misconduct.
[¶36] Standard 6.1 is entitled "False Statements, Fraud, and Misrepresentation," and it provides:
Absent aggravating or mitigating circumstances, ... the following sanctions are generally appropriate in cases involving conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court:
6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.
6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.
6.13 Reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents *838 are false or in taking remedial action when material information is being withheld, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.
6.14. Admonition is generally appropriate when a lawyer engages in an isolated instance of neglect in determining whether submitted statements or documents are false or in failing to disclose material information upon learning of its falsity, and causes little or no actual or potential injury to a party, or causes little or no adverse or potentially adverse effect on the legal proceeding.
[¶37] The BPR found that, consistent with Standard 6.12, Ms. Mears knowingly deceived Bar Counsel and the BPR with numerous false statements, causing a significant adverse effect on the disciplinary proceeding. Accordingly, it determined that suspension was the appropriate sanction under this section. Again, we find clear and convincing evidence supporting the BPR's finding in this regard.
[¶38] Based on these considerations, the BPR determined that a nine-month suspension from the practice of law was the appropriate sanction in Ms. Mears's case. Ms. Mears and the Wyoming State Bar object to this recommendation. Both parties assert that the BPR misapplied the ABA Standards. We evaluate their positions in turn.
[¶39] With regard to Standard 5.1, Ms. Mears claims it is difficult to understand which subsection of that standard was applied by the BPR. That claim is incorrect. The BPR cited disbarment as the appropriate sanction under this Standard, and that necessarily means it was applying Standard 5.11. Standard 5.11(a) involves criminal conduct, and is inapplicable here. It is clear, then, that the BPR was applying Standard 5.11(b). Ms. Mears claims that this standard is not applicable because her conduct did not involve handling a legal matter for a client or any matter before a court, and could not "seriously adversely" reflect on her fitness to practice law. We disagree. What we stated many years ago remains true today:
All members of the legal profession know that when they are admitted to practice law they assume certain obligations and duties which properly met must conform to certain standards in honesty and fair dealing as concerns their clients, the courts, the profession, and the public at large. It goes without saying that because of the very nature of a lawyer's work these standards should not be and are not low. In this state, before being admitted to practice, the applicant must take an oath that he will, among other things, "faithfully and honestly" discharge the duties of an attorney and counselor at law.
State Bd. of Law Exam'rs v. Brown , 53 Wyo. 42, 50, 77 P.2d 626, 629 (1938) (internal citation omitted). Ms. Mears's repeated misrepresentations to Bar Counsel and the BPR indicate a lack of honesty that reflects seriously and adversely on her fitness to practice law.
[¶40] Ms. Mears also takes issue with the BPR's application of Standard 6.12. As she points out, this standard involves the submission of false statements or documents "to the court." She asserts that this standard is inapplicable because her misrepresentations were made to Bar Counsel and the BPR, not to a court.
[¶41] We reject this assertion because, as we explained in Custis , ¶ 19, 348 P.3d at 829 :
[T]he [BPR] is an arm of this Court whose purpose is to investigate allegations of professional misconduct and to report its findings and recommendations to the Court, which is the ultimate decision-maker in attorney disciplinary matters. Sections 21(c)(iii) and (iv) of the current Disciplinary Code make it clear that the Court's determination of appropriate discipline is its own, but that the determination must be made upon the evidence that was presented to the Board at the hearing.
(quoting Bd. of Prof'l Responsibility v. Casper , 2014 WY 22, ¶ 8, 318 P.3d 790, 793-94 (Wyo. 2014) (quoting Bd. of Prof'l Responsibility v. Davidson , 2009 WY 48, ¶ 8, 205 P.3d 1008, 1012 (Wyo. 2009) ) ). The BPR is "an ancillary body structured by the Court and has no independent power, jurisdiction, or *839 authority other than that specifically delegated to it in accordance with these rules." Rule 16(b), Wyoming Rules of Disciplinary Procedure. Because the BPR is an ancillary body and arm of this Court, misrepresentations to the BPR are misrepresentations to this Court.
[¶42] The Wyoming State Bar also contends that the BPR misapplied the ABA Standards, and asserts that proper application of the standards indicates that disbarment is the appropriate sanction in this case. It objects to the BPR's application of Standard 6.12 because it applies "when a lawyer knows that false statements or documents are being submitted to the court." It asserts that Standard 6.11 is applicable, as it applies when "a lawyer, with the intent to deceive the court, makes a false statement." The Bar asserts that Ms. Mears herself made the false statements, making Standard 6.11 the applicable standard, and disbarment the appropriate sanction.
[¶43] Ms. Mears made the false statements herself, so Standard 6.11 is applicable, and disbarment may be an appropriate sanction. However, it is also true that Ms. Mears knew that false statements were being submitted. Accordingly, Standard 6.12 is also applicable, and suspension may be an appropriate remedy. Moreover, while we are obligated to consider the ABA standards in deciding what sanction to impose, we do not apply those standards mechanically or adhere to them rigidly. The Preface to the ABA Standards for Imposing Lawyer Sanctions explains that the standards are "guidelines which give courts the flexibility to select the appropriate sanction in each particular case of lawyer misconduct." American Bar Association, Center for Professional Responsibility, Annotated Standards for Imposing Lawyer Sanctions xx (2015). A degree of discretion is necessary and prudent in making decisions on appropriate sanctions.
[¶44] We have compared the BPR's recommended sanction of a nine-month suspension with the results of some of our relatively recent previous decisions imposing sanctions in circumstances where a lawyer made misrepresentations to a court. In Board of Prof'l Responsibility v. Stinson , 2016 WY 25, ¶ 10, 370 P.3d 72, 99 (Wyo. 2016), the lawyer "violated Rule 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation to the Court, [former clients,] and the various attorneys hired by the [former clients]." He was suspended from practice for a period of nine months. Id. , ¶ 3, 370 P.3d at 72. In Board of Prof'l Responsibility v. Bagley , 2013 WY 148, ¶ 11, 327 P.3d 721, 727 (Wyo. 2013), the lawyer submitted information to the court with certain discrepancies. He was suspended for ninety days. Id. , ¶ 2, 327 P.3d at 722. In Board of Prof'l Responsibility v. Cleveland , 2007 WY 7, 150 P.3d 184, 186 (Wyo. 2007), the lawyer filed a complaint containing allegations he knew were not true. He received a public censure. Id. at 185.
[¶45] We have also reviewed the precedent from other courts cited by Bar Counsel in support of his position that disbarment is the appropriate remedy. None of those cases is on par with the facts of this case. In In re Rawls , 936 N.E.2d 812, 816 (Ind. 2010) (per curiam), the Indiana Supreme Court disbarred an attorney who had submitted false information "to the Commission, acting as an agency of this Court, with intent of deceiving the Commission." In Rawls , however, the attorney had a significant prior disciplinary record, including prior suspensions. In addition to the misrepresentations during the disciplinary process, the attorney also violated other provisions of the Indiana Professional Conduct Rules. The Indiana Supreme Court summarized:
Respondent has demonstrated a pattern of neglect of his clients' cases, resulting in adverse dispositions, suspension of one client's driver's license, a missed opportunity to settle, and undue delay. Respondent made a series of intentional misrepresentations to the Commission during its investigations of grievances. Respondent created a fraudulent receipt, criminally forged a client's name on it, and submitted it to the Commission, acting as an agency of this Court, with the intent of deceiving the Commission. We therefore conclude that Respondent should be disbarred.
Id . In the present case, Ms. Mears has no prior disciplinary history and, fortunately, no clients were harmed by her misconduct.
*840 [¶46] Bar Counsel also cites to a decision from the Massachusetts Supreme Court commenting on the damage caused by attorneys who violate their duty to cooperate with bar disciplinary procedures:
Effective administration of bar disciplinary procedures depends on the cooperation of attorneys. Failure to cooperate reflects adversely on the attorney's fitness to practice law. See Matter of Sondej, 3 Mass. Att'y Discipline Rep. 183, 185 (1982). Without the cooperation of members of the bar, "the limited resources of the Bar Counsel, which are made available at the expense of the attorneys of this Commonwealth [are] devoted unnecessarily to the pursuit of the attorney." [Matter of ] Cohen, [3 Mass. Att'y Discipline Rep. 43,] 48 [ (1983) ]. Moreover, a reluctance to impose serious sanctions in instances of repeated failures to cooperate sends a message to the public that grievances against attorneys are not treated seriously. Id . at 45-46.
In re Garabedian , 416 Mass. 20, 616 N.E.2d 464, 467 (1993). We agree with the Massachusetts Supreme Court. We note, however, that we view the suspension of Ms. Mears as a serious sanction, and that in Garabedian , the attorney was suspended for six months.
[¶47] Finally, the BPR considered aggravating and mitigating factors. As aggravating factors, the BPR cited the submission of false evidence during the disciplinary process, Ms. Mears's refusal to acknowledge the wrongful nature of her conduct, and her substantial experience in the practice of law. As a mitigating factor the BPR cited the absence of a prior disciplinary record. We are not convinced that the submission of false evidence during the disciplinary process is properly considered as an aggravating factor in this case, as this is the same behavior for which Ms. Mears was found to have violated the rules of professional conduct. However, there is clear and convincing evidence that Ms. Mears refused to acknowledge the wrongful nature of her conduct, and that she has substantial experience practicing law. Her lack of prior disciplinary actions is also fully supported in the record.
[¶48] We recognize that the facts and circumstances of our prior cases are not identical to those in Ms. Mears's case. Taken together, however, these cases suggest a range of appropriate sanctions. The BPR's recommendation of a nine-month suspension in Ms. Mears's case falls at the high end of that range. The cases from other jurisdictions relied on by Bar Counsel are factually distinguishable and do not support disbarment in this case. Based upon the violations we have determined to be established by clear and convincing evidence, and taking into account the applicable aggravating and mitigating factors, we conclude that the BPR's recommendation of a nine-month suspension is appropriate.
[¶49] IT IS, THEREFORE, ORDERED:
1. That Traci E. Mears shall be suspended from the practice of law for a period of nine months, commencing June 15, 2018;
2. That Traci E. Mears shall pay to the Board of Professional Responsibility the sum of $8,149.06 for the costs of these proceeding as provided in Rule 25(e) of the Wyoming Rules of Disciplinary Procedure, plus the sum of $750.00 as an administrative fee as provided in Rule 25(b) of the Wyoming Rules of Disciplinary Procedure, no later than December 1, 2018; and
3. That Traci E. Mears shall comply with Rule 22 of the Wyoming Rules of Disciplinary Procedure regarding reinstatement after her suspension.
DATED this 5th day of June, 2018.
BY THE COURT:*
/s/ E. JAMES BURKE
Chief Justice

Before BURKE, C.J., and HILL†, DAVIS, FOX, and KAUTZ, JJ.
†Justice Hill retired from judicial office effective February 17, 2018, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2017), he was reassigned to act on this matter on February 20, 2018.